**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Lavar HAYWARD, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 24, 2000.

Filed June 27, 2000.

Karl Baker, Philadelphia, for appellant.

Catherine L. Marshall, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before JOHNSON, J., CERCONE, President Judge Emeritus, and OLSZEWSKI, J.

CERCONE, President Judge Emeritus.

¶ 1 Appellant, Lavar Hayward, appeals from the Judgment of Sentence imposed after his conviction for carrying a firearm without a license and carrying a firearm on the streets of Philadelphia.[1] After review, we reverse.

¶ 2 On October 1, 1998, at or around 9:00 p.m., Officer Johnathan Woodson, a Police Officer for the Temple University Police Department, was on foot patrolling in the 2100 block of Broad Street in Philadelphia. *See* N.T. Suppression Hearing, 1/22/99, at 4–5. Officer Woodson testified at Appellant's Suppression Hearing that while he was patrolling, an "unidentified passerby" told him that there was a group of six (6) to eight (8) males in the park area in the 1300 Block of Dauphin Street and that one of them was "brandishing a weapon." *Id.* at 5. Officer Woodson recounted that the unidentified individual also told him that the man in the park with the weapon was "tall," however the unidentified individual did not give any specific estimate of height. *Id.* at 7. Officer Woodson also stated that the nameless pedestrian did not provide any further descriptive identification of the man in the park with the weapon, such as the man's race or the clothing which he was wearing. *Id.* at 10, 11. Officer Woodson additionally testified that the pedestrian who provided this information did not at any time identify himself, nor had Officer Woodson ever seen this individual before this occasion or at any time thereafter. *Id.* at 11.

¶ 3 Officer Woodson then proceeded to the park area in the 1300 Block of Dauphin Street.[2] He testified that it took him ten

---

1. 18 Pa.C.S.A. §§ 6106, and 6108 respectively.

2. Officer Woodson estimated that the park area was 200–250 yards away from the Temple University Campus. *Id.* at 7.

minutes to arrive at the park. *Id.* at 8. When Officer Woodson arrived at the park area he was joined by six other Temple University Police Officers, whom he had radioed to assist him. *Id.* at 9, 12. Upon arrival in the park area, Officer Woodson testified that he saw eight or nine people present in the park, including the Appellant. Officer Woodson observed no one holding any type of weapon. *Id.* at 6. Officer Woodson testified that he "examined" the group of individuals and estimated the Appellant to be about six foot one (6' 1") to six foot two inches (6' 2") tall, however he observed that there were also a couple of individuals in the group who were "very close" in height to Appellant as well. *Id.* at 7–8.

¶ 4 Officer Woodson and the other officers then ordered the group of individuals in the park to "line-up" on the sidewalk. *Id.* at 9, 13. The individuals complied with the officers' request. While the males were standing on the sidewalk, Officer Woodson walked around and stood behind them. He asked if anyone had a weapon. *Id.* at 9. Appellant replied that he did. Officer Woodson and the other officers then proceeded to frisk everyone in the group. The frisk yielded a black semiautomatic 9–millimeter handgun, which Appellant had tucked into his waistband.

¶ 5 Appellant was arrested and charged with the offenses set forth, *supra*. He subsequently filed a suppression motion that was denied after the above referenced suppression hearing, which was held before the Honorable Annette Rizzo of the Court of Common Pleas of Philadelphia. After the suppression hearing was concluded, Appellant proceeded to a non-jury trial before Judge Rizzo. Judge Rizzo found Appellant guilty of both charges and imposed the aforementioned sentence. This timely appeal followed.

¶ 6 In this appeal, Appellant presents one issue for our consideration:

Did not the lower court err in denying appellant's motion to suppress where the officer conducting the stop of appellant did not possess the requisite reasonable suspicion to justify the *Terry*[3] stop in violation of the Fourth Amendment of the Federal Constitution and Article I, § 8 of the Pennsylvania Constitution?

Appellant's Brief at 3.

¶ 7 On appeal from the denial of a defendant's motion to suppress, this Court applies the following standard of review:

In an appeal from the denial of a motion to suppress our role is to determine whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings. In making this determination, we may consider only the evidence of the prosecution's witnesses and so much of the defense as, fairly read in the context of the record as a whole, remains uncontradicted. When the factual findings of the suppression court are supported by the evidence, we may reverse only if there is an error in the legal conclusions drawn from those factual findings.

*Commonwealth v. Jackson*, 548 Pa. 484, 487, 698 A.2d 571, 572 (1997); *Commonwealth v. J.B.*, 719 A.2d 1058, 1061 (Pa.Super.1998). As a reviewing court, we are therefore not bound by the legal conclusions of the suppression court and must reverse that court's determination if the conclusions are in error or the law is misapplied. *Commonwealth v. Queen*, 536 Pa. 315, 319, 639 A.2d 443, 445 (1994).

¶ 8 Appellant argues that Officer Woodson did not possess the requisite reasonable suspicion to allow him to order Appellant and all the other men present in the park to line up on the pavement for a *Terry* frisk, based only on the information received from the anonymous pedestrian. From our review of the relevant holdings of the United States Supreme Court and

3. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20  L.Ed.2d 889 (1968).

our Supreme Court concerning *Terry* stops by police, which are predicated solely on the word of anonymous informants, we must agree.

¶ 9 Our Supreme Court has recognized that there are three categories of interaction between citizens and the police:

The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. *See Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. *See Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Finally an arrest or "custodial detention" must be supported by probable cause. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Commonwealth v. Rodriquez*, 532 Pa. 62, 614 A.2d 1378 (1992)(footnote omitted).

*Commonwealth v. Ellis*, 541 Pa. 285, 293–294, 662 A.2d 1043, 1047–1048 (1995). *Accord In Re Evans*, 717 A.2d 542, 544 (Pa.Super.1998).

¶ 10 As our Court has recently stated:

In determining whether a "mere encounter" has risen to the level of an "investigative detention," the focus of our inquiry is on whether a "seizure" of the person has occurred. *Commonwealth v. Mendenhall*, 552 Pa. 484, 715 A.2d 1117, 1120 (Pa.1998). Within this context, our courts employ the following objective standard to discern whether a person has been seized: "Whether, under all the circumstances surrounding the incident at issue, a reasonable person would

believe he was free to leave." *Commonwealth v. Smith*, 1999 PA Super 96, 732 A.2d 1226, 1232 (Pa.Super.1999) (emphasis added). See also *Commonwealth v. Matos*, 543 Pa. 449, 672 A.2d 769, 774 (Pa.1996).

*Commonwealth v. McClease*, 2000 PA Super 91, ¶ 13, 750 A.2d 320 (Pa.Super.2000). Clearly Appellant in the instant case was subjected to a non-custodial investigative detention when the officers on the scene herded him into a "line up" with the other individuals. Any person in Appellant's position who was ordered by six uniformed armed police officers to assemble into a lineup on the sidewalk could not have reasonably believed that he was free to disregard the officers' command and leave the scene.

¶ 11 With respect to a non-custodial investigative detention based upon information received via an informant's tip, our Supreme Court has stated:

In evaluating whether a stop is justified, courts consider whether or not an informant's tip creates a reasonable suspicion of current criminal activity based on the totality of the circumstances. *Alabama v. White*, 496 U.S. 325, 328–29, 110 S.Ct. 2412, 2415, 110 L.Ed.2d 301 (1990); *Commonwealth v. Martin*, 705 A.2d 887, 892 (Pa.Super.1997); *Commonwealth v. Wilson*, 440 Pa.Super. 269, 275–76, 655 A.2d 557, 560–61 (1995)(citing *Commonwealth v. Epps*, 415 Pa.Super. 231, 233–34, 608 A.2d 1095, 1096 (1992)). The informant's reliability, veracity, and basis of knowledge are all relevant factors. *Alabama v. White*, 496 U.S. 325, 328, 110 S.Ct. 2412, 2415, 110 L.Ed.2d 301 (1990)(citing *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983)). Of course, the information supplied to the police by the informant must contain "specific and articulable facts" that lead the police to reasonably suspect that criminal activity may be afoot. See *Commonwealth v. Melendez*, 544 Pa. 323, 676 A.2d 226, 228 (1996)(citing *Terry v. Ohio*, 392 U.S. 1,

21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)).

Commonwealth v. Allen, 555 Pa. 522, 527–528, 725 A.2d 737, 740 (1999), cert. denied, —— U.S. ——, 120 S.Ct. 285, 145 L.Ed.2d 239, 68 U.S.L.W. 3232 (1999).

¶ 12 Thus "[i]n analyzing an anonymous tip, we must determine whether under the 'totality of circumstances' the informant's tip established the necessary reasonable suspicion that criminal activity was afoot." Commonwealth v. Martin, supra, 705 A.2d at 892 quoting Alabama v. White, supra, 496 U.S. at 328, 110 S.Ct. at 2415. "[Both] quantity and quality of information are considered when assessing the totality of the circumstances. If information has a low degree of reliability, then more information is required to establish reasonable suspicion." Commonwealth v. Wimbush & Commonwealth v. White, 561 Pa. 368, 375, 750 A.2d 807, 811 (2000).

¶ 13 It is a fundamental truth that an informant's cloak of anonymity may also be a shield behind which the informer may hurl unwarranted and unfounded accusations with impunity, secure in the belief that he or she will never reap the consequences of his or her mendacity. It is this elemental principle of human nature which has caused the Supreme Court of our Commonwealth to reject the notion that the word of an anonymous informant alone, without any knowledge of that informant's reliability or any independent corroboration or observation of illegal activity by the police, can serve as the basis for subjecting an individual citizen to detention and a physical search of his or her person. This is because, in our free and democratic society, a stop of a citizen by a police officer and a search of that citizen is not to be regarded as a minor or trifling disruption of that citizen's constitutionally guaranteed right to be free of unreasonable searches and seizures.

¶ 14 As our Supreme Court has reminded:

It is simply fantastic to urge that a careful exploration of the outer surfaces of a person's clothing all over his or her body performed in public while the citizen is helpless, perhaps facing a wall with his hands raised, is a petty indignity. It is a serious intrusion on the sanctity of the person which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly.

Jackson, at 488, 698 A.2d at 573 quoting Terry, 392 U.S. at 16–17, 88 S.Ct. at 1877, 20 L.Ed.2d at 903.

¶ 15 These considerations were of paramount importance in our Supreme Court's decision in the case of Commonwealth v. Anderson, 481 Pa. 292, 392 A.2d 1298 (1978). In Anderson, the police received a telephone call from an anonymous caller who said there was a man who was an escapee from a drug rehabilitation program in a bar at a particular location. The caller described the man as an African–American male named "Perry" who was about 5'10" with a large "bush" hair style and wearing a dark coat. Id. at 293, 392 A.2d at 1299.

¶ 16 In response, two police officers were dispatched to the bar. Once in the bar they saw Anderson who they believed matched the description of the person referred to in the telephone call. One of the police officers initiated conversation with Anderson and asked if he was carrying weapons. Before Anderson could respond, the other officer touched Anderson's jacket pocket and felt what he believed to be a gun. The object was taken from the pocket by one of the officers and it was revealed to be a .22 caliber handgun. Anderson was arrested, charged and convicted of a variety of offenses relating to possession of the firearm. Prior to his trial Anderson filed a motion to suppress the firearm as evidence, which was denied. The Court of Common Pleas of Philadelphia denied his petition for a writ of certiorari and our Court affirmed his conviction. Id. at 294, 392 A.2d at 1299.

¶ 17 On appeal, the Supreme Court reversed our Court, holding that the search of Anderson was improper under the circumstances and that consequently the evidence of the firearm should have been suppressed. In reversing, our Supreme Court had occasion to discuss the fundamental public policy considerations and constitutional interests which a court must consider and carefully weigh when determining if the actions of the police in detaining and frisking an individual were warranted:

> In striking the balance between the public interest and the individual's right to personal security free from arbitrary interference of law enforcement officials, the initial inquiry must focus upon the propriety of the initial restraint of appellant's freedom of movement.[3] *Adams v. Williams*, [407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1977 [1972]).] As noted by Mr. Justice Harlan in a concurring opinion in *Terry*, the right to "frisk" depends upon the reasonableness of a forcible stop to investigate a suspected crime. *Terry v. Ohio*, 392 U.S. at 33, 88 S.Ct. 1868.[4]

The reasonableness "of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers", *United States v. Brignoni–Ponce*, 422 U.S. at 878, 95 S.Ct. at 2579. The *Terry* Court made it clear that such a balance cannot be struck where the police are acting upon information that would not warrant a man of reasonable caution in the belief that the action taken was appropriate. *Terry v. Ohio*, 392 U.S. at 21–22, 88 S.Ct. 1868.

> "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. See, e.g., *Beck v. Ohio*, supra [379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142]; *Rios v. United States*,

364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). And simple ' "good faith on the part of the arresting officer is not enough." ... If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers, and effects," only in the discretion of the police.' *Beck v. Ohio*, supra, at 97, 85 S.Ct. at 229 [13 L.Ed.2d at 148]." *Id.* at 22, 88 S.Ct. at 1880.

**Here the officers were acting upon an anonymous tip. Because of the general nature of the description it cannot be argued that the tip was corroborated by the appellant's presence in the bar. Moreover, there was nothing observable in his conduct in the officers' presence to suggest that he was in anyway involved in criminal activity or that he was the person they were seeking. In fact the only basis for the officers' belief that a crime had occurred rested upon unverified information supplied by the unidentified informer. Even though the intrusion here may be termed modest, we do not believe that the officers here possessed a reasonable suspicion to justify the "stop."**

---

[3] There is no serious question that Anderson was not free to ignore the officers' inquiry and walk away.

[4] "So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search ..." (emphasis added; footnote and citations omitted) *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1977 [1972]).

*Anderson*, at 297–298, 392 A.2d 1298, 392 A.2d at 1300–1301 (emphasis supplied).

¶ 18 Thus, this case clearly set forth the principle that if police receive unverified information from an unknown person, which consists solely of a generalized description of a person allegedly en-

gaged in criminal activity at a particular location, that information, in and of itself, does not provide the police with the requisite reasonable suspicion to detain and search an individual who merely happens to be at the specified location and who matches the general description given by the informant. Some other independent corroboration of the individual's involvement in criminal activity is required. Mere *presence alone* of an individual at a particular place, as described by the anonymous informant, does not establish that the individual is engaged in criminal activity.

¶ 19 Almost twenty years after *Anderson* was decided, the Pennsylvania Supreme Court reaffirmed this principle in a series of three cases: *Commonwealth v. Hawkins*, 547 Pa. 652, 692 A.2d 1068 (1997), *Commonwealth v. Kue*, 547 Pa. 668, 692 A.2d 1076 (1997) and *Commonwealth v. Jackson*, 548 Pa. 484, 698 A.2d 571 (1997). *Hawkins* and *Kue* are plurality opinions authored by Chief Justice Flaherty and joined by Justices Zappala and Cappy, with Justice Nigro concurring in the result and Justices Newman and Castille dissenting. *Hawkins* and *Kue* are therefore not binding precedent, however they are nonetheless instructive because their reasoning was fully adopted by a clear majority of our Supreme Court in *Jackson*.[4]

¶ 20 In *Hawkins*, a Philadelphia Police officer received a radio call that there was a black male with a gun standing at a particular intersection wearing a "blue cap, black jeans and a gold or brownish coat." *Id.* at 654, 692 A.2d 1068. The officer arrived at the intersection three minutes after receiving the call and observed the appellant, Hawkins, who fit the description broadcast on the radio. The police officer stopped and frisked Hawkins, discovering a gun in his waistband.

¶ 21 Later, at the suppression hearing, the police officer admitted that he did not know the source of the information contained in the radio call, and there was no other testimony provided at the hearing as to the basis of the information that the officer received. Nonetheless, the suppression motion was denied, as was appellant's writ of certiorari to the Court of Common Pleas. Our Court affirmed the denial of the suppression motion, but the Supreme Court reversed. Justice Flaherty, writing for the plurality, said:

> If the police respond to an anonymous call that a particular person at a specified location is engaged in criminal activity, and upon arriving at the location see a person matching the description but nothing more, they have no certain knowledge except that the caller accurately described someone at a particular location. As the United States Supreme Court observed in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the fact that a suspect resembles the anonymous caller's description does not corroborate allegations of criminal conduct, for anyone can describe a person who is standing in a particular location at the time of the anonymous call. Something more is needed to corroborate the caller's allegations of criminal conduct. The fact that the subject of the call was alleged to be carrying a gun, of course, is merely another allegation, and it supplies no reliability where there was none before. And since there is no gun exception to the *Terry* requirement for reasonable suspicion of criminal activity, in the typical anonymous caller situation, the police will need an independent basis to establish the requisite reasonable suspicion.

*Hawkins*, at 656–657, 692 A.2d at 1070–1071. Justice Flaherty made clear that there is no automatic "man with a gun" exception to the requirement that the police have an independent basis, beyond

---

**4.** In *Jackson,* Mr. Justice Cappy wrote the majority opinion which was joined by Chief Justice Flaherty, and Justices Zappala and Nigro. Justices Newman and Castille renewed their dissents which they had previously raised in *Hawkins* and *Kue.*

that of the information received from an anonymous source, to justify a stop and frisk of an individual.

¶ 22 In the companion case of *Commonwealth v. Kue*, 547 Pa. 668, 692 A.2d 1076 (1997), decided the same day as *Hawkins*, Chief Justice Flaherty again authored a plurality opinion invalidating a stop and frisk of an individual, which was, once more, based solely on the police receipt of anonymous information from an unknown source. In *Kue*, the police received a radio report that an Asian male, who was wearing a striped shirt, was "armed with a gun" and standing at a particular street corner. Three minutes after receiving the report, the officer arrived at the street corner referred to in the tip. He saw four Asian males standing on the corner, and he proceeded to stop and frisk each of them. During the course of the frisk the police officer discovered that appellant Kue was carrying a gun tucked in his waist band. As in *Hawkins*, the source of the tip was never determined, but the evidence was not suppressed by the Municipal Court. A writ of certiorari to the Court of Common Pleas of Philadelphia was denied and our court affirmed, holding that the police had met the constitutional requirements for a lawful *Terry* stop.

¶ 23 Again the Supreme Court reversed. Justice Flaherty wrote:

[I]n order for police to act on an anonymous tip, the *Terry* requirement of reasonable suspicion of criminal activity must still be satisfied and must be independent of the telephone tip itself. Here, there was no independent reason to believe that criminal conduct was afoot, and the police officer, therefore, had no reason to search anyone, whether it was the man with the striped shirt or his companions.

*Id.* at 671, 692 A.2d at 1078.

¶ 24 Finally in *Commonwealth v. Jackson*, 548 Pa. 484, 698 A.2d 571 (1997) the plurality holdings of *Hawkins* and *Kue* acquired the force of binding precedent. In *Jackson*, the police received a radio report that a man with a green jacket was carrying a gun and could be found in a particular location. Within two minutes of receiving the report, the officer arrived at the location where the individual was reported to be and observed an individual with a green jacket, the appellant Jackson, merely standing there and doing nothing else. The police officer exited his vehicle and frisked Jackson. During the course of the search, a small key box fell to the ground near where Jackson was standing. The key box contained cocaine. *Id.* at 487, 698 A.2d at 572. Jackson was arrested and sought to have the evidence of the cocaine suppressed. This suppression motion was denied by the Municipal Court of Philadelphia and upheld by both the Court of Common Pleas and our Court.

¶ 25 Our Supreme Court reversed. Relying in part on its prior rationale in *Hawkins*, the Court said:

This case is factually indistinguishable from *Hawkins*. In *Hawkins*, we held that before the police may undertake a stop and frisk on the basis of an anonymous tip of a man with a gun, the police must establish that they have a reasonable suspicion that the individual is involved in, or about to commit a crime. **If the tip contains sufficient information, the police can do this by corroborating sufficient details of the tip. Otherwise, the police must investigate further by means not constituting a search and seizure.** If, as a result, they acquire sufficient information to give rise to a reasonable suspicion that the individual is armed and dangerous, they may then initiate a *Terry* stop. Neither condition was met in this case, and therefore the search was illegal.

*Id.* at 493, 698 A.2d at 575 (emphasis supplied). Our Supreme Court also expressly rejected the Commonwealth's argument that so long as the anonymous tip provides a physical description of an individual, an accurate location where the individual may be found, and an allegation that the indi-

vidual is armed, then a *Terry* stop is justified. *Id.* at 492, 698 A.2d at 575.

¶ 26 Hence, *Jackson* established that a simple lone statement by an anonymous individual that a person in a particular location has a gun does not, in of itself, furnish the requisite reasonable suspicion to make an investigative detention of that person constitutionally permissible under both the Fourth Amendment to the United States Constitution and Article I Section 8 of the Pennsylvania Constitution.[5] Some additional corroboration of that person's involvement in criminal activity is required before a *Terry* stop may be undertaken.

¶ 27 The Supreme Court of the United States unanimously reached the same conclusion in the recent case of *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254, 68 U.S.L.W. 4236 (2000). In that case, the police received an anonymous phone tip that there was a young black male standing at a particular bus stop, wearing a plaid shirt, and carrying a gun. Officers proceeded to the bus stop, and, when they arrived there, they saw three black males, one of whom was wearing a plaid shirt. However, the officers observed nothing which would lead them to conclude that the individuals at the bus stop were engaged in illegal activity. They did not see a firearm, nor did any of the individuals make any threatening or unusual movements. Nevertheless, the officer immediately approached J.L, the individual wearing the plaid shirt, and told him to put his hands up on the bus stop. The officer then proceeded to frisk him, and, as a result of the frisk, the officer discovered a handgun concealed in J.L's pocket. J.L. was arrested and charged with carrying a concealed firearm without a license and possession of a firearm while under the age of 18. *Id.* at ——, 120 S.Ct. at 1377, 146 L.Ed.2d at 259.

¶ 28 Prior to trial J.L. sought suppression of the firearm as the fruit of an unlawful search. Both the trial court and the Florida Supreme Court agreed that the evidence should have been suppressed, since the search was invalid under the Fourth Amendment to the United States Supreme Court. Florida sought review from the United States Supreme Court which granted certiorari. The unanimous Court agreed that the *Terry* stop and frisk conducted by the officer was improper since the anonymous tip itself did not provide the requisite reasonable suspicion for such action.

¶ 29 Writing for the unanimous Court Justice Ginsburg said:

In the instant case, the officers' suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller. Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, see *Adams v. Williams*, 407 U.S. 143, 146–147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," *Alabama v. White*, 496 U.S., at 329, 110 S.Ct. 2412, 110 L.Ed.2d 301. As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Id.*, at 327, 110 S.Ct. 2412. The question we here confront is whether the tip

---

5. Our Supreme Court specified in *Jackson* that it was resolving the issue of the legality of the stop and frisk based on both Article I Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution. *Id.* at 488, 698 A.2d at 572–573. The Court noted that the requirements for a constitutional "stop and frisk" of an individual by the police are the same pursuant to Article I, Section 8 of the Pennsylvania Constitution as they are under the Fourth Amendment to the United States Constitution. *Id. See also Wimbush/White, supra,* at 810, fn. 2. *Commonwealth v. Melendez,* 544 Pa. 323, 327–328, 676 A.2d 226, 230 (1996).

pointing to J.L. had those indicia of reliability.

In *White*, the police received an anonymous tip asserting that a woman was carrying cocaine and predicting that she would leave an apartment building at a specified time, get into a car matching a particular description, and drive to a named motel. *Ibid.* Standing alone, the tip would not have justified a *Terry* stop. *Id.*, at 329, 110 S.Ct. 2412. Only after police observation showed that the informant had accurately predicted the woman's movements, we explained, did it become reasonable to think the tipster had inside knowledge about the suspect and therefore to credit his assertion about the cocaine. *Id.*, at 332, 110 S.Ct. 2412. Although the Court held that the suspicion in *White* became reasonable after police surveillance, we regarded the case as borderline. Knowledge about a person's future movements indicates some familiarity with that person's affairs, but having such knowledge does not necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband. We accordingly classified *White* as a "close case." *Ibid.*

The tip in the instant case lacked the moderate indicia of reliability present in *White* and essential to the Court's decision in that case. The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis

for believing he had inside information about J.L. If *White* was a close case on the reliability of anonymous tips, this one surely falls on the other side of the line.

Florida contends that the tip was reliable because its description of the suspect's visible attributes proved accurate: There really was a young black male wearing a plaid shirt at the bus stop. Brief for Petitioner 20–21. The United States as amicus curiae makes a similar argument, proposing that a stop and frisk should be permitted "when (1) an anonymous tip provides a description of a particular person at a particular location illegally carrying a concealed firearm, (2) police promptly verify the pertinent details of the tip except the existence of the firearm, and (3) there are no factors that cast doubt on the reliability of the tip...." Brief for United States 16. These contentions misapprehend the reliability needed for a tip to justify a *Terry* stop.

**An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.**

*Id.* 529 U.S. at ——–——, 120 S.Ct. at 1378–1379, 146 L.Ed.2d at 260–261 (emphasis supplied).

¶ 30 The Court also made clear that there is no automatic firearm exception to the *Terry* rule. The Court acknowledged that firearms are dangerous instrumentalities, however the Court reminded that they had already accounted for this factor in allowing *Terry* stops on the basis of reasonable suspicion and not requiring that police officers meet the higher stan-

dard of probable cause. The Court pointed out that were they to carve out such a *per se* firearms exception, then there was no limit to the number of exceptions which could be created to justify *Terry* frisks based on mere anonymous assertions of criminal conduct. The Court noted: "If police officers may properly conduct *Terry* frisks on the basis of bare-boned tips about guns, it would be reasonable to maintain under the above-cited decisions that the police should similarly have discretion to frisk based on bare-boned tips about narcotics. As we clarified when we made indicia of reliability critical in *Adams* and *White*, the Fourth Amendment is not so easily satisfied." *Id.* 529 U.S. at ——, 120 S.Ct. at 1380, 146 L.Ed.2d at 261–262.

¶ 31 Very recently in *Wimbush/White, supra*, our Supreme Court held that an anonymous phone tip that a black man named "Tony" would be driving a white van on a particular road and carrying drugs was insufficient, by itself, to provide reasonable suspicion for a traffic stop of a van being driven by an individual who appeared to be the subject of the tip. The Court specified that the police needed "something more" than the anonymous tip to justify conducting an investigatory stop of the subject's vehicle, namely independent corroboration of criminal activity on the part of the subject. *Id.* at 813.

¶ 32 The Court also held, in a companion case, that an anonymous telephone tip which conveyed that a black man with drugs, wearing a white shirt and shorts, would be exiting a particular apartment complex and getting on a black bicycle was an insufficient basis for an officer to perform a *Terry* stop and patdown of an individual who was leaving the named apartment complex and who happened to match the description given in the tip. Again the Court noted the need for "something more" than the tip itself to justify the detention. *Id.*, at 812.

¶ 33 The Court said:

There was, however, no corroboration of the tipster's allegations of criminal con-

duct to justify Officer Matthew's stop. While White's appearance was consistent with the anonymous caller's overly general description and White did exit the housing complex on the described bicycle, Officer Matthews observed no unusual conduct which would suggest that criminal activity was afoot. As such, Officer Matthew's surveillance produced no reason independent of the unreliable, anonymous tip to suspect that White was involved in criminal conduct. Rather, the only basis for Officer Matthew's belief that a crime had been committed remained the information obtained from the uncorroborated tip that bore no indicia of reliability. Under *Jackson*, this basis is simply not adequate to establish the reasonable suspicion required to conduct an investigatory stop.

*Wimbush/White*, 750 A.2d at 812.

¶ 34 We deem the articulated legal principles in the cases discussed above controlling in the case *sub judice*. The mere fact that this particular tip of a man with a weapon was conveyed in person by an anonymous individual, rather than via telephone call, does not compel a different result. The informant who provided the initial information to the police officer was still an anonymous individual. It is the pedestrian informant's complete anonymity and corresponding lack of any indicia of his reliability that is a critical factor.

¶ 35 As the United States Supreme Court has recognized, if an informer is known to the police, or identifies him or herself to the police, then there is an indicia of reliability attached to the tip, because the informant has placed himself or herself at risk for prosecution for giving false information to the police if the tip is untrue. *See Adams v. Williams, supra* (word of pedestrian informer that individual was armed and carrying drugs was valid basis for *Terry* stop since informer was deemed reliable because his identity was known to the police and because he had

provided reliable information to the police in the past as part of criminal investigations). There is, however, no such inherent indicia of reliability in the word of an anonymous informer who has never cooperated with the police in the past or who does not disclose his or her identity to the police. Clearly if the police do not even know an informant's name, or have never had any dealings with the informer on prior occasions, then it cannot reasonably be said that they have any adequate basis to ascertain anything about the informant's reliability, veracity, or the accuracy of his or her tip.

¶ 36 Merely because the unknown tipster in the case at bar conveyed his information in person to the police as opposed to telephonically did not automatically endow the information contained within his tip with greater presumed accuracy and reliability. Nor did it establish that he was acting with veracity. The individual who approached the officer on the street was completely unknown to him. The officer had never seen this individual before or had any knowledge that this individual had provided accurate and reliable information to the police in the past. The individual did not identify himself to the officer, nor did he accompany the officer to the park to point out the individual who was "brandishing the weapon." The nameless pedestrian did not appear at the Appellant's hearing to testify as to his observation that he saw the Appellant "brandishing a weapon." The pedestrian was and is, in all respects, a completely anonymous individual, and as such, his reliability is equivalent to that of an unknown individual who telephones an anonymous tip to the police that there is a man with a gun in a particular location.

¶ 37 Since the identity and veracity of the pedestrian informant remained unknown, there was therefore no objective basis under these particular circumstances for the officer to conclude that the information provided by this individual was accurate or reliable. Thus, the officer need-ed "something more" than the tip itself to effectuate a *Terry* stop of an individual who might possibly be the subject of the tip. He needed some independent corroboration of that individual's involvement in criminal activity.

¶ 38 However the officer upon arriving in the park did not independently observe Appellant or any of the other individuals present engaging in anything remotely resembling criminal activity. Like the defendants in *Anderson, Hawkins, Kue, Jackson* and *J.L.*, the Appellant and the other individuals in the park were merely present in a public area when the officer arrived on the scene. The tip itself provided no specific predictive basis as to the activities of any of the individuals present in the park that would not be known to anyone in the public at large. There was therefore no other basis, aside from the word of the anonymous pedestrian, to infer that Appellant had been actively involved in the commission of a crime or would be actively involved in the commission of a crime in the immediate future.

¶ 39 Additionally, the anonymous pedestrian's description of the individual allegedly "brandishing a weapon" was considerably less detailed than the descriptions conveyed by the anonymous callers in *Anderson, Hawkins, Kue, Jackson* and *J.L.* In those cases, the anonymous callers specifically described the race and clothing of the individual who was the subject of the tip. Nevertheless, as discussed above, those descriptions, though detailed, were held to be insufficient bases to justify *Terry* stops of individuals who merely matched the descriptions.

¶ 40 In the case at bar, all the anonymous pedestrian told the officer was that there was a "*tall* man in the park brandishing a weapon." The pedestrian did not provide any other identifying characteristics of the individual to the officer. Indeed, the officer testified that when he arrived at the park ten minutes after encountering the pedestrian he saw eight (8) or nine (9) individuals in the park, some of

whom were close in height to the Appellant. *See* N.T. Suppression Hearing, *supra* at 8.

¶ 41 It therefore logically follows that if a detailed physical description given by an anonymous informant of an individual allegedly engaged in criminal activity is, in and of itself, an insufficient basis for an investigative detention of a subject who simply matches that detailed description, then a skeletally vague description of a "tall man brandishing a weapon" certainly cannot provide the requisite reasonable suspicion for a detention. Such a generic description as that provided by the pedestrian to the officer in this case constitutes the veritable essence of vagueness. Indeed, if we were to accept the rationale that the officer was permitted to stop and frisk on the basis of this skeletally vague description, then any male citizen who was present in the park at the time the officer arrived, and who the officer subjectively thought was "tall" would have been subjected to a *Terry* stop. This is constitutionally impermissible.

¶ 42 It is also for this reason that we deem the cases of *In the Interest of S.D.*, 429 Pa.Super. 576, 633 A.2d 172 (1993) and *Commonwealth v. Collazo*, 692 A.2d 1116 (Pa.Super.1997), which the Commonwealth has advocated as controlling authority, inapplicable to the instant case. Both of these cases involved significantly different factual circumstances than those present in the case at bar.

¶ 43 In the case of *In the Interest of S.D.*, 429 Pa.Super. 576, 633 A.2d 172 (1993) a police officer testified that he spoke with a pedestrian at 5:25 a.m. who claimed that there were "two armed black men" with drugs around the corner. *Id.* at 173. The officer immediately proceeded to the location where the pedestrian told the officer the men would be standing, which was a mere fifty (50) feet away. *Id.* at 174. Upon arrival, the officer observed only two black men in the exact location where the pedestrian said that they would be. *Id.* at 174. The officer executed an immediate patdown search and discovered drugs.

¶ 44 Our Court upheld the legality of the stop and frisk. However, in doing so our Court focused on the existence of other corroborating factors, which gave the officer an independent basis to act on the informant's tip. Specifically we noted that the area where the encounter with the pedestrian took place and the area where the individuals were arrested were areas with a high incidence of drug trafficking. We also noted the time of the morning, 5:25 a.m. *Id.* at 174. Thus we concluded: "The time and the place of the encounter in this case provided an independent basis for the officer to act on the informant's tip." *Id.*

¶ 45 As the Commonwealth acknowledges, there is no mention or discussion in *S.D.* as to whether the investigating officer obtained or previously knew the identity of the pedestrian, or whether the pedestrian had previously provided reliable information to the police. However, significantly, in our Court's discussion of the concerned citizen we said: "**Identified** citizens who report their observations of criminal activity to the police are assumed to be trustworthy, in the absence of special circumstances." *Id.*, 633 A.2d at 174 fn.1. Our Court derived its authority for this proposition from the case of *Commonwealth v. Bruner*, 388 Pa.Super. 82, 564 A.2d 1277 (1989), a case in which an *identified and specifically named* individual, who had been the victim of an assault, had filed a complaint with the police. In this complaint, the victim gave the police a detailed report in which he said that he personally observed marijuana and cocaine in a particular apartment. Our Court held that the specific information provided by this "named informant" was sufficient to support an affidavit of probable cause for a search warrant of the apartment. *Id.* 564 A.2d at 1282. Thus, this tends to suggest that our Court in *S.D.* was dealing with a named citizen informant.

¶ 46 Nevertheless, even if we assume *arguendo* that the informant in *S.D.* was unnamed and unknown, this case is still distinguishable on its facts alone. Unlike the pedestrian in *S.D.*, the pedestrian in the case at bar provided no identifying characteristics of the person "brandishing a weapon," just that he was "tall." Nor was there any testimony in the instant case as to the nature of the area in which Officer Woodson spoke with the pedestrian or the nature of the park, which tended to establish that these areas were high crime areas in which greater than normal numbers of people had been arrested for incidents involving guns and drugs. In *S.D.* there was such specific testimony, which we noted gave the officer an independent corroborating basis for the tip. Moreover, the time of the evening in which Appellant, an adult male, was in the park was much earlier than the time in which the defendant in *S.D.*, a juvenile, was observed in a public area.[6] Furthermore, it also took Officer Woodson ten minutes for him to arrive at the park, whereas the investigating officer in *S.D.* proceeded immediately and directly to the scene designated by the pedestrian, which was a short distance away. All of these distinguishing factors establish that this case cannot be considered controlling authority.

¶ 47 In *Commonwealth v. Collazo*, 692 A.2d 1116 (Pa.Super.1997) a police officer was exiting the police station when he was approached by a man who told the Officer that there was a man selling drugs at a nearby intersection. The man specifically described the individual as "wearing a black hat and blue shirt and riding a gold bicycle." *Id.* at 1117. The officer immediately proceeded to the intersection and observed an individual, the defendant, who was wearing a black hat, a blue shirt, and straddling a gold bicycle. The officer approached the defendant and engaged him in conversation. The officer told the de-

fendant that he had information that he was selling drugs. The defendant denied the allegation. The officer then asked the defendant if he could search him and his bicycle. The officer explained to the defendant that he could stop the search at any time. At that point, the defendant gave his consent for the search to proceed. The search yielded a knife and some marijuana, and, as a result, the defendant was arrested. *Id.*

¶ 48 The defendant sought to have the evidence of the search suppressed; however, the trial court denied the suppression motion, and this denial was affirmed by our Court. Our Court rejected the defendant's argument that the stop and questioning was not justified based solely on the pedestrian citizen's tip. However, in arriving at this conclusion we expressly noted that the description of the person involved in criminal activity given by the citizen to the officer was very detailed and specific. *Id.* at 1118. This is again quite unlike the description given by the pedestrian in the instant case.

¶ 49 Moreover, as in *S.D.*, *supra*, there was no mention by our Court in *Collazo* as to whether or not the citizen who provided the initial information had identified himself to the officer or was previously known to the officer as having provided reliable information. Notably, however, our Court, in its discussion, once more chose to rely on a citation from *S.D.* for the proposition that "**Identified** citizens who report their observations of criminal activity to police are assumed to be trustworthy in the absence of special circumstances." *Id.* at 1118 citing *S.D.* 633 A.2d at 174, n. 1 (emphasis supplied).

¶ 50 Also, the police officer in *Collazo* did not immediately subject the defendant to a detention or pat down search on the basis of the tip alone. As a result of the

---

6. Philadelphia has a curfew ordinance specifically prohibiting juveniles under the age of eighteen (18) from being out on the city streets after 10:30 p.m. and before 6:00 a.m.

*See Philadelphia Code of Ordinances* 10–303. *In Interest of William M.*, 440 Pa.Super. 140, 655 A.2d 158 (1995), *appeal denied*, 542 Pa. 649, 666 A.2d 1058 (1995).

**38**

tip, the officer in *Collazo* first merely approached the defendant and engaged him in conversation. The officer in the case at bar immediately detained Appellant and the others upon his arrival in the park. This case is therefore also factually inapposite.

¶ 51 Our Court is obliged to follow the precedent as set forth by our Supreme Court. *See Foflygen v. Zemel*, 420 Pa.Super. 18, 615 A.2d 1345, 1353 (1992), *appeal denied*, 535 Pa. 619, 629 A.2d 1380 (1993) ("As an intermediate appellate court, this Court is obligated to follow the precedent set down by our Supreme Court."); *See also Commonwealth v. Randolph*, 553 Pa. 224, 230, 718 A.2d 1242, 1245 (1998) ("It is a fundamental precept of our judicial system that a lower tribunal may not disregard the standards articulated by a higher court."). As our Supreme Court has recognized, to allow police to detain any individual based simply on vague and uncorroborated allegations of criminal activity made by an anonymous individual, who then vanishes like an ephemeral specter after conveying this information, would eviscerate the guarantee afforded every citizen by the United States and Pennsylvania Constitutions to be free from unreasonable searches and seizures. The anonymous tipster may have, as the Supreme Court stated in *Jackson supra*, merely an unparticularized hunch, or perhaps even worse, harbor a sinister desire to harass another individual by making that individual the subject of an unwarranted police detention or search. As Justice Stevens has also cogently observed, were courts to sanction *Terry* stops solely on the basis of anonymous tips then "every citizen is subject to being seized and questioned by any officer who is prepared to testify that the warrantless stop was based on an anonymous tip predicting whatever conduct the officer just observed." *Alabama v. White, supra*, 496 U.S. at 333, 110 S.Ct. at 2418 (Stevens J. dissenting)

¶ 52 This is not to say that anonymous tips are without any worth or utility.

Clearly anonymous tips have useful value to the police in that they serve as the basis and starting point of further investigation. Our Supreme Court has noted:

As explained in *Hawkins*, where the police are acting on information supplied anonymously, the public will receive its full measure of protection by police who act within constitutional restraints. *Hawkins*, 547 Pa. at 657–658, 692 A.2d at 1071. When the police receive unverified information that a person is engaged in illegal activity, the police may observe the suspect and conduct an investigation. If police surveillance produces a reasonable suspicion of criminal conduct, the suspect may be stopped and questioned.

*Wimbush/White, supra*, at 811–812. Accord *Martin, supra*, 705 A.2d at 893, n. 5.

¶ 53 In sum, the officer in the instant case was certainly free to investigate further on the basis of the anonymous pedestrian's tip, and he is to be commended for promptly proceeding to the park for the purposes of checking out the anonymous pedestrian's report. However, as the Supreme Court has made clear, the anonymous tip itself was not a basis for the officer to make an immediate *Terry* stop absent some independent corroboration by him of criminal activity. The officer was therefore not free to immediately detain every individual whom he saw on the belief that they might be the "tall" individual the unidentified pedestrian was referring to. Detaining and forcing an individual to be subjected to the indignity of an impromptu public police lineup requires more reasonable suspicion of that citizen's involvement in criminal activity than vague uncorroborated allegations of an anonymous pedestrian.

¶ 54 Because the physical evidence seized from Appellant's person was obtained by contravening his rights under the Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution, we re-

verse the order of the Court of Common Pleas denying Appellant's suppression motion, and we remand for a new trial. We further order that the evidence obtained during the search of the Appellant be suppressed in any future proceeding.[7]

¶ 55 Reversed and remanded for proceedings consistent with this decision. Jurisdiction relinquished.

---

**7.** We note also that the fact that Appellant's admission to possession of a gun in response to Officer Woodson's question does not establish consent for the pat down search. Appellant had already been illegally detained when he made this statement. It is axiomatic that consent obtained from a defendant who has been detained in the absence of any reasonable suspicion will not support a search, since the consent is the product of the illegal detention and not an independent act of free will. *Commonwealth v. Wright*, 448 Pa.Super. 621, 672 A.2d 826, 830 (1996); *Commonwealth v. Vasquez*, 703 A.2d 25, 32 (Pa.Super.1997)