J-E02005-25                    2026 PA Super 49

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| MARCUS ROBINSON | : | |
| | : | |
| Appellant | : | No. 907 EDA 2024 |

Appeal from the Judgment of Sentence Entered February 7, 2024
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000147-2023

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., OLSON, J., STABILE, J., KUNSELMAN, J., MURRAY, J., KING, J., SULLIVAN, J., and LANE, J.

OPINION BY PANELLA, P.J.E.:                    **FILED MARCH 17, 2026**

Marcus Robinson appeals from the judgment of sentence entered on February 7, 2024, for his convictions of persons not to possess, use, manufacture, control, sell or transfer firearms, firearms not to be carried without a license, and carrying firearms on public streets or public property in Philadelphia.[1] Robinson challenges the trial court's denial of his motion to suppress. After careful review, we affirm.

The trial court provided the relevant factual and procedural history:

On May 25, 2023, [Robinson] litigated a motion to suppress physical evidence, contending that "there was no reasonable suspicion or probable cause for the police to stop, question, frisk, or ultimately arrest [Robinson]." Following the hearing, the [trial] court took the matter under advisement, and on June 27, 2023, issued its ruling on the record denying [Robinson's] motion. On September 25, 2023, [Robinson] proceeded to a stipulated bench trial before the [trial] court, which found him guilty of persons not

_____

[1] 18 Pa.C.S.A. §§ 6105(a)(1), 6106, and 6108, respectively.

to possess firearms, firearms not to be carried without a license, and carrying firearms on public streets in Philadelphia.

Sentencing was deferred pending a presentence investigation ("PSI"). On February 7, 2024, upon consideration of the PSI report and all relevant facts and circumstances of this case, the [trial] court sentenced [Robinson] to 6 to 12 years' incarceration and to a concurrent term of 7 years' probation.

On February 20, 2024, [Robinson] filed a motion for reconsideration of sentence, which the [trial] court denied on March 7, 2024. On March 19, 2024, [Robinson] filed a notice of appeal to [this] Court. On March 20, 2024, the [trial] court ordered [Robinson] to file a Pa.R.A.P. 1925(b) statement of matters complained of on appeal. Following an extension of time granted by the [trial] court, [Robinson] timely filed his Rule 1925(b) statement on May 31, 2024.

At the suppression hearing, the Commonwealth presented the testimony of Philadelphia Police Officer Robert Heeney. Officer Heeney testified that on December 19, 2022, he was on routine patrol with his partner, Officer Grant[2], in the 22nd Police District in North Philadelphia. The officers were patrolling in the vicinity of the 2600 block of North Warnock Street, an area known for PCP narcotic sales and shootings. Officer Heeney personally had responded to at least 15 shootings in that particular area, where he also had made 3 arrests for firearms violations. On said date, at approximately 1:09 p.m., Officer Heeney and his partner were traveling on the 1000 block of West Oakdale Street, when they made a left turn onto the 2600 block of Warnock Street. As they turned onto Warnock Street, Officer Heeney heard someone say "Oh, shit" really loud. He looked to his left and observed [Robinson] standing on the east sidewalk with his right hand tucked under his left arm. [Robinson] "then began to blade his body to the left, at which point he removed his right arm and kept his left arm pinned to his left side."

At that point, Officer Grant asked [Robinson] if he was okay, to which [Robinson] responded "No" and "looked around nervously." Officer Heeney testified that he and his partner exited their vehicle and approached [Robinson]. Officer Grant asked him if he had any

_____

[2] Officer Grant's first name does not appear in the certified record.

- 2 -

weapons, and [Robinson] said, "No"—but his arm was still pinned against his left side. [Robinson] then lifted up the right side of his shirt, at which point Officer Heeney observed an object protruding out the back left side of [Robinson's] jacket. Officer Heeney told his partner, "His left side." [Robinson] took a deep breath and said, "Okay," and put his right hand up in the air as if he was turning himself in. Officer Grant asked [Robinson] if he had a permit to carry a firearm, to which [Robinson] responded, "No." Officer Grant asked [Robinson] to raise his left arm, at which point a .45 caliber handgun fell to the ground. The officers then took [Robinson] into custody. They secured the firearm—which was loaded with one live round in the chamber and seven live rounds in the magazine—and placed it on a property receipt.

[Robinson] testified on his own behalf. According to him, on the date and time at issue, he was smoking outside, waiting for his friend to come out of his grandmother's house. [Robinson] was "observing everything that was around him." At the moment he saw the police, he said, "Oh, shit"—however, it was not due to their presence, it was because he burnt himself. [Robinson] testified that the police then approached in their vehicle and asked him if he was all right, to which he responded, "Yeah." According to [Robinson], the officers backed up and "engaged in some conversation" with two other guys across the street—but then pulled back up to him and exited their vehicle.

[Robinson] further testified that the police were more than one hundred feet away from him and had the windows up when he said, "Oh shit." Thus, according to [Robinson], there was no way they could have heard him. However, [Robinson] acknowledged Officer Heeney's testimony that he heard [Robinson] say, "Oh, shit," and further admitted that the officer asked him if he was okay as a result:

> Q. But you heard Officer Heeney testify here today that he heard you say, oh, shit, right?
>
> A. Yeah. He pulled up and said, are you all right?

N.T. [Suppression Hearing,] 05/25/23, at 29-31.

Upon careful consideration of the record and pertinent law, the [trial] court denied [Robinson's] motion to suppress on June 27, 2023.

- 3 -

Trial Court Opinion, 6/27/24, at 1-4 (unnecessary capitalization, some record citations, brackets, parentheses, headings, and footnotes omitted).

Before we turn to the merits of Robinson's claim, we note that this Court certified the case for *en banc* review to address whether a court can lawfully impose a concurrent sentence of probation and incarceration. This case was listed for oral argument consecutive with **Commonwealth v. Jennings**, --- A.3d ---, 1128 EDA 2024 (Pa. Super. filed Jan. 14, 2026) (*en banc*). As this Court found in **Jennings** that a court may lawfully impose a concurrent sentence of probation and incarceration, we briefly address that issue and then turn to Robinson's suppression claim. **See Jennings**, --- A.3d at *12.

Both Robinson and the Commonwealth argue the court imposed a legal sentence. We therefore turn to **Jennings** and the arguments made therein.

Jennings asserted the trial court did not have authority to sentence him to probation concurrent with incarceration. **See id.** at *6. He believed that probation may only be used either by itself when "prison is unnecessary, or as a tail to aid reintegration" into society. **Id.** However, Jennings did not challenge the constitutionality of the statute, nor did he argue its language was ambiguous. **See id.** at *12.

This Court, after reviewing the relevant statutes and case law, held "Section 9721(a) [of title 42] permits trial courts to impose concurrent terms of probation and total confinement. As Section 9721(a)'s terms are 'clear and

free from all ambiguity,' we may not disregard them 'under the pretext of pursuing' the statute's spirit." ***Id.*** (citation omitted).

Because "the language of 42 Pa.C.S.A. § 9721(a) (sentencing generally) clearly and unambiguously permits trial court to impose concurrent terms of probation and total confinement[,]" we find no illegality in the sentence imposed upon Robinson. ***Id.*** at *1.

We now turn to Robinson's claim:

Did the lower court err in denying the motion to suppress physical evidence and statements where police detained Mr. Robinson without reasonable suspicion of criminal activity, by restricting his freedom of movement and asking questions seeking incriminating information which an ordinary person would not have felt free to disregard?

Appellant's Brief, at 4.

We begin with our well-established standard of review:

An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on the appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the trial court are subject to plenary review.

Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress. Also, it is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony.

**Commonwealth v. Wright**, 224 A.3d 1104, 1108 (Pa. Super. 2019) (citations, brackets, quotation marks, and ellipsis omitted).

Robinson argues he was subjected to an investigative detention when "police used their bodies to pin [him] in." Appellant's Brief, at 15. Robinson further asserts that because police "approached him from opposite sides, [they] prevent[ed] his ability to walk away." **Id.** Robinson claims this created an investigative detention, and police did not have reasonable suspicion at the time they pinned him in between them. **See id.** at 21.

Both "[t]he Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution prohibit unreasonable searches and seizures." **Commonwealth v. Saunders**, 326 A.3d 888, 896 (Pa. 2024) (citation omitted). "It is quite plain that the Fourth Amendment governs seizures of the person which do not eventuate in a trip to the station house and prosecution for crime; whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person." **Commonwealth v. Gibson**, 333 A.3d 710, 717 (Pa. Super. 2025) (internal quotation marks, brackets, ellipsis, and citation omitted).

We begin with a discussion of the three types of police-citizen interactions:

The law recognizes three distinct levels of interaction between police officers and citizens: (1) a mere encounter; (2) an investigative detention, often described as a **Terry** stop, **see Terry v. Ohio**, 392 U.S. 1 [](1968); and (3) a custodial detention.

A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond, and therefore need not be justified by any level of police suspicion.

In contrast, an investigative detention carries an official compulsion to stop and respond. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity.

Finally, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest. This level of interaction requires that the police have probable cause to believe that the person so detained has committed or is committing a crime.

**Commonwealth v. Jefferson**, 256 A.3d 1242, 1247-48 (Pa. Super. 2021)

(*en banc*) (some citations, quotation marks, and ellipses omitted).

A mere encounter can

escalate[] to an investigatory stop if a reasonable person would have believed that he was not free to leave. When that happens, for the stop to be proper the police must have reasonable suspicion, based upon specific and articulable facts, that criminal activity is afoot. … [A] proper reasonable suspicion analysis considers the totality of the circumstances surrounding the stop and affords due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience. The totality of circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer. *Per se* rules are incompatible with a totality-of-the-circumstances inquiry.

*Commonwealth v. Lewis*, 343 A.3d 1016, 1028 (Pa. 2025) (citations, brackets, and quotation marks omitted).

We have further elaborated:

No bright lines separate these types of encounters, but the United States Supreme Court has established an objective test by which courts may ascertain whether a seizure has occurred to elevate the interaction beyond a mere encounter. The test, often referred to as the "free to leave test," requires the court to determine whether, taking into account all of the circumstances surrounding the encounter, the police would have communicated to a reasonable person that he was not at liberty to ignore the police and go about his business. …

In applying this "free to leave" test, the focus is whether the suspect has in some way been restrained by physical force or show of coercive authority.

In considering whether a seizure has occurred, or whether a reasonable person would feel free to leave, courts may examine the following nonexclusive list of factors: The number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked. Although no single factor controls our analysis, both the United States and Pennsylvania Supreme Courts have held that the approach of a police officer followed by questioning does not constitute a seizure. The circumstances must present some level of coercion, beyond the officer's mere employment status, that conveys a demand for compliance or threat of tangible consequences from refusal.

*Commonwealth v. Joyner*, 348 A.3d 230, 236 (Pa. Super. 2025) (citations, brackets, and some quotation marks omitted).

Notably, "a show of authority designed to stop a person, but which is not accompanied by the use of physical force, is not a seizure unless the

individual actually submits to the show of authority." **Gibson**, 333 A.3d at 720 (citation omitted).

Based on the foregoing, we must first determine when Robinson was seized: when the encounter turned from a mere encounter to an investigative detention. Then we can evaluate what information the officer possessed at that time and if that information qualifies as reasonable suspicion.

Robinson argues he was seized when the officers "pinned him in[.]" Appellant's Brief, at 10. The Commonwealth does not identify exactly when it maintains the mere encounter turned to an investigative detention but notes it could not have been until after the officers were already out of their vehicle and noticed the bulge that they correctly believed to be a firearm. **See** Appellee's Brief, at 10-11.

The trial court found:

Police encountered [Robinson] in a high-crime area known for PCP narcotics sales and shootings. Officer Heeney personally had responded to at least 15 shootings in the area and had made 3 arrests for illegal firearm possession. When police encountered [Robinson] in this high-crime area, he was acting *increasingly* suspiciously. First, upon noticing the presence of police, [Robinson] said, "Oh, shit," which drew their attention to him. [Robinson] then proceeded to tuck his right hand under his left arm and blade his body away from the officers. After removing his right arm, [Robinson] continued to pin his left arm against his side. At that point, Officer Grant asked [Robinson] if he was okay, to which [Robinson] responded "No" and "looked around nervously."

The above series of actions prompted the officers to exit their vehicle and approach [Robinson]. Officer Grant asked him if he had any weapons, and [Robinson] said, "No"—but he continued to pin his left arm against his side. While speaking with [Robinson],

Officer Heeney could see an object protruding from the left side of [Robinson's] jacket. Based on all the above circumstances, it was reasonable for the officers to believe that [Robinson] was attempting to conceal an illegal firearm. Accordingly, Officer Heeney alerted his partner to [Robinson's] "left side." Prior to any further activity, Officer Grant asked [Robinson] if he had a permit to carry a firearm, to which [Robinson] responded, "No." Officer Grant then asked [Robinson] to raise his left arm, at which point a loaded, .45 caliber handgun fell to the ground. Police recovered the firearm and placed [Robinson] under arrest. In sum, [Robinson's] actions warranted a brief investigatory detention, during which police determined that [Robinson] was not permitted to carry a firearm prior to securing the dropped weapon or arresting [Robinson]. Simply put, [Robinson's] rights were not violated in this case.

Trial Court Opinion, 6/27/24, at 7-8 (emphasis in original).

While the trial court does not explicitly state when the encounter turned into an investigative detention, it appears to believe it was while the officers were asking questions of Robinson, after they exited their vehicle. ***See id.***

We agree with all parties that the initial questioning of Robinson was a mere encounter. Robinson was free to leave at this point. When Robinson answered "No," he was not okay and looked around nervously, the officers' suspicion was piqued.

At that point, the officers exited their patrol vehicle and went to speak further with Robinson. The entire encounter with Robinson lasts just over one minute from initial encounter to arrest. Upon viewing the officers' body worn cameras ("BWC"), there is no sound until the one-minute mark. ***See*** Exhibit C-1 at 1:00; D-1 at 1:00.

As is clear from viewing both BWCs, at no point was Robinson "pinned in" as he tries to claim. *See* Exhibit C-1 at :28-:55; D-1 at :30-:55. Officer Grant went to the side of the car Robinson is leaning against, while Officer Heeney went to the other side. *See* Exhibit C-1 at :34. However, Officer Heeney walked first behind a fence and looked around, then went to the back of the car where he stood in the middle of the trunk area. *See id.* at 34-40. The officers did nothing at this time to coerce Robinson to remain or to talk to them; there was a clear path if Robinson chose to walk away, however, Robinson did not do so. We therefore find Robinson was not subject to an investigative detention while the officers were questioning him. *See Commonwealth v. Jones*, 226 A.3d 1090, 1095 (Pa. Super. 2021) ("[W]ith respect to the show of authority needed for a detention, the circumstances must present some level of coercion, beyond the officer's mere employment, that conveys a demand for compliance or threat of tangible consequences from refusal.") (citation omitted).

The encounter turned investigative at the moment Robinson "submit[ted] to the show of authority" by raising his "right hand up in the sky as if he[ was] giving up." N.T. Suppression Hearing, 5/25/23, at 10; *see also* Exhibit C-1 at :55; *Gibson*, 333 A.3d at 720 ("Under the Fourth Amendment, a show of authority designed to stop a person, but which is not accompanied by the use of physical force, is not a seizure unless the individual actually submits to the show of authority.").

The next step, following the finding at what point Robinson had been seized, is to determine whether the officers had reasonable suspicion of criminal activity at that time.

Robinson initially argues that "[t]he classification of a neighborhood as a 'high crime area' has been deemed legally irrelevant" in determining if there is reasonable suspicion of criminal activity. Appellant's Brief, at 18-19. Robinson claims the Pennsylvania Supreme Court's decision in **Commonwealth v. Barr**, 266 A.3d 25 (Pa. 2021), supports his belief. **See id.** at 18. We disagree.

After Robinson filed his brief, our Supreme Court decided **Commonwealth v. Lewis**, 343 A.3d 1016 (Pa. 2025). There the Court considered "the quantum of evidence necessary to prove an area is high in crime, such that a suppression court may properly consider that fact among the totality of the circumstances when assessing whether reasonable suspicion existed at the time of a stop." **Lewis**, 343 A.3d at 1021. The Court noted:

> [In **Illinois v. Wardlow**, 528 U.S. 119, 124 (2000), the United States Supreme Court] explained that officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. [The Court] therefore held the fact that the stop occurred in a high crime area was a relevant contextual consideration in assessing reasonable suspicion[.]
>
> At first blush, this principle seems unremarkable. If a proper reasonable suspicion analysis considers the totality of the circumstances surrounding the stop, then, logically, this might include the location of the stop in some cases. After all, we have recognized that prudent police officers on patrol pay close attention to every detail of their surroundings and take their

- 12 -

knowledge of the area into account when considering a stop. Thus, for example, an officer observing a hand-to-hand transaction on a street corner will naturally be more suspicious if he knows the corner is a hotspot for heroin sales than if the corner has no meaningful history of drug trafficking. It would be simply illogical to expect officers to ignore those details, or to conclude that an officer's experience regarding them is not a relevant factor informing reasonable suspicion.

*Id.* at 1030-31 (quotation marks, brackets, and citations omitted).

The Court then considered **Barr**, where the defendant was stopped in his vehicle for a minor traffic infraction, and explained that "[u]nder those circumstances, the fact that the area where the stop occurred was generally high in crime would have added nothing probative to the legal determination of whether the police had probable cause to search the vehicle." *Id.* at 1031. Clearly, then, the type of interaction helps the courts determine whether the area being high crime is relevant under the totality of the circumstances.

The Court held that whether an area is high crime is relevant in assessing reasonable suspicion, but an officer may not simply intone "high crime area." *Id.* "The Commonwealth bears the burden of proving a high-crime area is, in fact, high in crime, and the suppression court is free to discredit the Commonwealth's evidence when appropriate." *Id.* at 1035 (citations omitted). The Court provided a nonexclusive list of factors to assist in determining if an area is high crime: "the geographic scope of the high-crime area; the nexus between the type of crime the area is known for and the type of crime suspected on the day of the stop; the officer's level of familiarity with the area; the recency of the officer's information; empirical

data known to the officer; and the assignment of specialized police units targeting high-crime areas." ***Id.*** at 1036 (citation omitted).

Here, the suppression hearing was held before ***Lewis*** was decided, but some of the factors were touched upon at the hearing. Officer Heeney confined the "high crime area" to the 2600 block of North Warnock Street. N.T. Suppression Hearing, 5/25/23, at 6-8. Officer Heeney responded to 15 shootings in that area "over the last couple years." ***Id.*** at 7. He further has made three illegal firearms arrests in that area. ***See id.*** Officer Heeney has been working that area for approximately six years. ***See id.*** at 6. While "over the past couple years" was not further defined, clearly the officer's information was fairly recent. Finally, we note there was no testimony provided regarding empirical data or specialized police units in that area. However, we find the information sufficient to qualify the area as high crime, just as the trial court did. Therefore, the area being high crime was a relevant consideration in determining whether the officers had reasonable suspicion.

As explained above:

[A] proper reasonable suspicion analysis considers the totality of the circumstances surrounding the stop and affords due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience. The totality of circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

***Lewis***, 343 A.3d at 1029 (citations, brackets, and quotation marks omitted).

The information the officers had before the encounter turned to an investigative detention included: the area being known for shootings and illegal firearms, *i.e.*, high crime; Robinson loudly exclaiming "Oh, shit" upon seeing the officers; Robinson responding he was not okay when asked and looking around nervously; Robinson's odd behavior of holding his hand under his other arm, then removing it while keeping his arm pinned to his body and turning his body so that arm (and the bulge from the firearm he was concealing) would be out of the officers' sight; and the officers' belief that the concealed bulge was a firearm. This information constituted sufficient reasonable suspicion to subject Robinson to a pat down or frisk for weapons. *See Commonwealth v. Carter*, 105 A.3d 765, 775 (Pa. Super. 2014) (*en banc*) (reversing a trial court's order granting suppression because the defendant turned his body to conceal a bulge in his jacket pocket in a high crime area creating reasonable suspicion). However, a frisk was not required, as the firearm dropped from Robinson as soon as he moved his left arm. Robinson had already admitted that he did not have a permit to carry a concealed firearm. Therefore, at the point when the firearm fell, the officers had probable cause to place Robinson under arrest for illegal possession of a firearm.

We therefore find the trial court did not err in denying Robinson's motion to suppress based on its finding the stop and arrest of Robinson was with the requisite suspicion. As such, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/17/2026