J-A27029-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| DAMON M. BELLESEN | : | |
| Appellant | : | No. 2666 EDA 2024 |

Appeal from the Judgment of Sentence Entered September 9, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005434-2021

BEFORE: BOWES, J., MURRAY, J., and BECK, J.

MEMORANDUM BY MURRAY, J.: **FILED APRIL 10, 2026**

Damon M. Bellesen (Appellant) appeals from the judgment of sentence imposed following his non-jury convictions of one count each of persons not to possess firearms, firearms not to be carried without a license, carrying firearms on public streets in Philadelphia, and resisting arrest.[1] Appellant challenges the trial court's denial of his motion to suppress physical evidence and the sufficiency of the evidence supporting his conviction of persons not to possess firearms. After careful examination, we affirm in part and vacate in part, and remand for resentencing.

The trial court summarized the evidence presented at Appellant's suppression hearing as follows:

_____

[1] 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1), 6108, 5104.

[T]he Commonwealth presented the testimony of Amtrak Police Sergeant William Battista [(Sergeant Battista)]. Sergeant Battista, who had 25 years of experience as a police officer, including the previous 14 years with Amtrak, testified that on April 21, 2021[,] he was working [the] night shift at 30th Street Station in Philadelphia. Sergeant Battista testified that during his shift that night, police radio broadcasted a call for a robbery at the SEPTA "El" subway station (located across the street [from 30th Street Station]) with a description of [the perpetrator as an] African-American male with light skin, wearing dark clothing. Later, at approximately 11:45 p.m., Sergeant Battista was standing outside the main entrance to 30th Street Station, when an African-American male [("the complainant")] **approached [Sergeant Battista] and -- pointing toward [Appellant] -- said, "[T]his guy just tried to rob [me] with a gun."** [N.T., 11/20/23, at 8-9 (emphasis added).] Sergeant Battista clarified that the [complainant] used an expletive, stating, "[T]his fucking guy tried to rob me with a gun." [*Id.* at 9.] Sergeant Battista then pursued [Appellant] inside 30th Street Station to investigate.

Sergeant Battista testified that he walked up to [Appellant] and asked if [Appellant] had a weapon on him, "five, maybe six times" but [Appellant] "did not answer." [*Id.* at 10.] Accordingly, Sergeant Battista retrieved his handcuffs and told [Appellant] that he was not under arrest, and that he was just being detained. When Sergeant Battista placed his handcuff on [Appellant's] left wrist, [Appellant] took off running toward the exit doors. Another [police] officer stationed by the doors, Sergeant Antoine,[2] prevented [Appellant] from exiting and took him to the ground. A firearm was then recovered from [Appellant's] person. ([*See id.*] at 10-20).

Sergeant Battista also was presented with police body-worn camera footage depicting the above events, including, among other things: the complainant approaching Sergeant Battista and pointing; [Appellant] wearing all black clothing; Sergeant Battista asking [Appellant] at least five times if he had a firearm on him; [Appellant's] failure to respond on each occasion; Sergeant Battista attempting to detain [Appellant] with handcuffs while advising him that he was not under arrest, he was just being

---

[2] The record does not disclose the full name of Sergeant Antoine, who did not testify at the suppression hearing or at trial.

detained; [Appellant's] headlong flight toward the exit doors; and back[-]up officers' apprehension of [Appellant] and subsequent retrieval of a firearm from [Appellant's] pants. (*See* [*id.*] at 13-21; Exhibits C-7 & C-8).[FN1]

---

[FN1] **The videos also depicted the complainant standing in the background and watching as the police investigated** [**Appellant**]. (*See* Exhibit C-8 at 0:58-1:13; Exhibit C-7 at 0:31-36).

---

On cross-examination, Sergeant Battista testified that in response to the police radio call for a robbery at the adjacent SEPTA station, his unit sent two police officers over to investigate[,] but they did not find any suspects. Additionally, Sergeant Battista testified that he had not encountered [Appellant] prior to the incident at bar, and therefore[,] did not know whether [Appellant] had a license to carry a firearm. [Sergeant Battista] confirmed that when he "initially made contact with [Appellant], [Appellant] did not appear to have a firearm on him." [*Id.* at 26 (punctuation modified).] Sergeant Battista also acknowledged that, while detaining [Appellant], he placed his right hand on [Appellant's] shoulder and squeezed [Appellant's] jacket pocket with his left hand. Sergeant Battista further testified that [Appellant] did not flee until his left hand was placed in a handcuff. In addition, **Sergeant Battista testified that the [complainant,] who ... report[ed] the robbery and point[ed] at [Appellant,] was not subsequently identified.** Finally, Sergeant Battista [confirmed] that his fellow officers continued to search [Appellant] while he was on the ground, and [Appellant] admitted that the gun was in his pants only after Sergeant Battista stated[,] "[J]ust be straight, we're going to find it, just tell me do you have it." [*Id.* at 30-31 (punctuation modified).]

[Appellant] then called Amtrak Police Officer Cyle Cavanagh [(Officer Cavanagh)] to the stand. Officer Cavanagh testified that he was on duty the night of April 21, 2021, during which time he received a radio call for [a] person with a gun at the subway station across the street from 30th Street Station, with a description of [the perpetrator as a] light-skinned black male wearing all black clothing. Officer Cavanagh testified that in response to the call, he went to the SEPTA station to investigate but did not find anyone matching the description. When he

- 3 -

returned to 30th Street Station, however, he observed a male ([*i.e.*, Appellant]), who matched the description. Officer Cavanagh testified that he did not stop [Appellant] based on his matching the description[;] rather, [Appellant] already had been stopped in response to someone who flagged down officers at the station and stated that [Appellant] had just robbed him. ([**See id.**] at 33-43).

Officer Cavanagh also was presented with his body-worn camera footage, which was played in court. Officer Cavanagh acknowledged that the video depicted [Appellant] carrying a water bottle in his left hand and a phone in his right hand. He also testified that [Appellant] was being placed in handcuffs in order to conduct an investigatory detention. Finally, Officer Cavanagh acknowledged that he did not find a firearm based on his initial pat down, but found it after [Appellant] told him where it was[, while Appellant] was handcuffed and surrounded by multiple officers and a K-9. (**See** [*id.*] at 42-47; Exhibit C-6/D-3).

Trial Court Opinion, 11/25/24, at 1-4 (FN1 in original; one original footnote and some record citations omitted; emphasis and one footnote added).

Following his arrest, the Commonwealth charged Appellant with the above-mentioned offenses. In May 2021, Appellant posted bail and was released pending trial.[3] On October 6, 2022, the Commonwealth filed a motion for modification of bail. The Commonwealth pointed out Appellant's arrest in Case 8515 and asserted he "has demonstrated that he cannot be trusted to remain arrest free." Motion for Modification of Bail, 10/6/22, ¶¶ 5, 7. The trial court granted the Commonwealth's motion.

---

[3] While out on bail, in October 2022, Appellant was arrested and charged with gun and drug offenses related to a separate criminal incident in Philadelphia, docketed at CP-51-CR-0008515-2022 (Case 8515).

Appellant filed his suppression motion on October 13, 2022. Appellant claimed his arrest was unlawful, where, *inter alia*, "he was subjected to a stop and frisk on less than reasonable suspicion." Omnibus Pre-Trial Motion, 10/13/22, at 1.

Appellant's suppression hearing occurred on November 20, 2023. Sergeant Battista and Officer Cavanagh testified as the only witnesses, consistent with the foregoing factual recitation. Following the conclusion of evidence, the suppression court considered the parties' respective arguments. N.T., 11/20/23, at 48-70. Appellant asserted police lacked reasonable suspicion to believe he was involved in criminal activity, and therefore, his detention was unlawful and all evidence obtained as a result must be suppressed as being tainted by the illegal detention. ***See id.*** at 48-62. Appellant argued, *inter alia*, that

> [the complainant, who was] unidentified … [and] we don't know anything about [him], essentially[,] **what he said** [**to police**] **equates to … an anonymous tip because he's an unidentified person** making this allegation without any additional information, [and] we have no details about what happened, [or] why he's saying this.

***Id.*** at 54 (emphasis added); ***see also id.*** at 56-57 (Appellant claiming, "without any additional corroboration from the police from their own observation of what's going on, they … cannot have reasonable suspicion to detain [Appellant].").

The prosecutor countered,

> I believe that it is against every piece of case law to argue that what happened in this case is an anonymous tip. …. This [case] is far different[;] this is a person pointing at [Appellant] and saying, that guy robbed me with a gun.

*Id.* at 63. The suppression court deferred ruling on Appellant's suppression motion. *Id.* at 70.

On February 6, 2024, the suppression court issued its findings of fact and conclusions of law on the record. *See* N.T., 2/6/24, at 3-5; *see also* Pa.R.Crim.P. 581(I). The suppression court announced the following conclusions of law:

> This court had the opportunity to observe the demeanor of the witness[es] during their testimony and evaluate the[ir] credibility, as well as review portions of the body-worn camera video introduced into evidence. **To the extent that [Appellant] argues this was an anonymous tip, this court disagrees. The complainant, even though he did not remain on the scene, clearly indicated who he believed robbed him. There was reasonable suspicion to stop and investigate [Appellant] based on this information.** [Appellant] was evasive, was advised he was being detained[,] and resisted those efforts and began struggling, therefore, allowing for his arrest. The gun was found lawfully pursuant to that arrest. Therefore, [Appellant's] motion to suppress is denied.

N.T., 2/6/24, at 4-5 (emphasis added; some capitalization modified).

On March 14, 2024, Appellant filed a motion for reconsideration of the denial of his suppression motion. Appellant again asserted police lacked reasonable suspicion to detain him, where "the only basis for the officers' belief that a crime had occurred rested upon unverified information supplied by" the complainant, who was never identified. Motion for Reconsideration,

3/14/24, ¶ 13.  On March 15, 2024, the suppression court held a hearing on Appellant's motion, and considered argument from the parties.

On March 20, 2024, the suppression court granted in part, and denied in part, Appellant's motion for reconsideration.  Specifically, the court granted suppression regarding Appellant's statements to police, but denied suppression regarding the gun seized from his person.  ***See*** N.T., 3/20/24, at 3.  The matter then immediately proceeded to a stipulated non-jury trial.

During the brief non-jury trial,[4] the parties entered into several stipulations, including the following stipulation regarding the charge of persons not to possess firearms under 18 Pa.C.S.A. § 6105 (hereinafter, "Florida conviction stipulation"):

> Commonwealth's Exhibit 5, Your Honor, there's a stipulation by and between [the] parties as to [the exhibit's] authenticity and admissibility.  It's [] a certified document from the Clerk of the Circuit County Courts of the Ninth Judicial Circuit for Orange County, Florida, showing a plea or guilty verdict for [Appellant] on one charge of manslaughter, **which would disqualify him under [section] 6105 from possessing a firearm**.

N.T., 3/20/24, at 9-10 (emphasis added); ***see also id.*** at 10 (admitting Commonwealth Exhibit 5 into evidence).

Immediately following the Florida conviction stipulation, the Commonwealth rested its case.  ***Id.*** at 10.  Appellant offered "no argument" or objection to any of the stipulations.  ***Id.***  The trial court found Appellant

---

[4] Neither the Commonwealth nor Appellant presented any witnesses at trial.

guilty of the aforementioned crimes. *Id.* The court deferred sentencing pending the preparation of a presentence investigation and mental health report. *Id.* at 10-11.

On September 9, 2024, the trial court sentenced Appellant[5] to an aggregate term of 3½ to 7 years' imprisonment, and nine years of **concurrent** probation.[6, 7] This timely appeal followed. Appellant and the trial court have complied with Pa.R.A.P. 1925.

_____

[5] The trial court initially sentenced Appellant, on May 1, 2024, to an aggregate 10 to 20 years' incarceration, followed by one year of probation. However, on May 13, 2024, Appellant filed a motion for reconsideration of sentence, which the trial court subsequently granted.

[6] The trial court ordered Appellant's sentence to run concurrently with the sentence previously imposed by a separate judge in Case 8515, wherein Appellant received an aggregate sentence of 9 to 18 years in prison. Appellant timely appealed his judgment of sentence in Case 8515. That appeal also is before this panel, docketed at 2429 EDA 2024.

[7] We pause to address, *sua sponte*, the legality of the trial court's imposition of a concurrent sentence of probation and incarceration. ***See Commonwealth v. Rosario***, 294 A.3d 338, 342 n.4 (Pa. 2023) ("An appellate court can raise and address the legality of a sentence *sua sponte*."). On this point, this Court stayed this appeal pending *en banc* decisions in ***Commonwealth v. Jennings***, 1128 EDA 2024, and ***Commonwealth v. Robinson***, 907 EDA 2024. Order, 11/25/25. This Court in ***Jennings*** filed a published opinion, wherein we held that "the language of 42 Pa.C.S.A. § 9721(a) (sentencing generally) clearly and unambiguously permits trial courts to impose concurrent terms of probation and total confinement." ***Commonwealth v. Jennings***, ___ A.3d ___, 2026 PA Super 8, at 2 (Pa. Super. filed Jan. 14, 2026) (*en banc*); *see also **Commonwealth v. Robinson***, ___ A.3d ___, 2026 PA Super 49, at 7 (Pa. Super. filed March 17, 2026) (*en banc*) (relying upon ***Jennings***). Accordingly, in the instant appeal, based on ***Jennings*** and ***Robinson***, we discern no illegality in Appellant's sentence, and vacate our stay order.

Appellant presents two issues for our consideration:

1. Did the police illegally stop and frisk Appellant based on an uncorroborated tip from an unnamed informant who immediately fled the scene?

2. Was the evidence insufficient for [a] conviction under 18 Pa.C.S. § 6105, where Appellant's out-of-state conviction for "manslaughter" was not equivalent to any disqualifying offense under Section 6105(b)?

Appellant's Brief at 3.

Appellant first claims the denial of his suppression motion was improper because police lacked reasonable suspicion to detain him, where the sole information that formed the basis of the unlawful detention originated from an "anonymous tip." *See id.* at 11-21. Appellant emphasizes that the complainant

> spoke with police for less than a minute before disappearing from the scene. The police never learned [the complainant's] name, much less his phone number, or where to find him, and they never asked him what [Appellant] had actually done, or where or when [Appellant] had done it. Nor did [police] look for any corroboration in anything that [Appellant] said or did in their presence.

*Id.* at 11; *see also id.* at 12 ("[N]o one had any way of contacting [the complainant], and if his report had been a prank or a vendetta[,] there was no way to hold him responsible for it.").

According to Appellant, "[t]he word of an anonymous informant, without corroboration by police at the scene, can never be the sole justification for a stop or frisk." *Id.* at 12. Appellant claims that the trial court, in its Pa.R.A.P. 1925(a) opinion, "cites no authority holding that an informant who speaks to

- 9 -

police 'in person' cannot be 'anonymous' if his or her identity remains unknown[.]" *Id.* at 16. According to Appellant, "this Court has explicitly held that such a person **can** be an anonymous source." *Id.* (emphasis in original) (citing *Commonwealth v. Hayward*, 756 A.2d 23 (Pa. Super. 2000), and *In re J.N.Y.*, 931 A.2d 685 (Pa. Super. 2007)).

The Commonwealth counters the denial of Appellant's suppression motion was proper, where police had reasonable suspicion to stop and frisk Appellant based upon the complainant's in-person identification of Appellant as the perpetrator of the attempted robbery. *See* Commonwealth Brief at 8-15. The Commonwealth asserts that "[a]lthough the [complainant] was ultimately not identified, the nature of his personal interaction with police is a far cry from what the law considers 'anonymous.'" *Id.* at 8. The Commonwealth points out that the complainant

> was on-site, directly identified [Appellant] by pointing to him, and accused [Appellant] of having "just" tried to rob him with a gun. (N.T.[,] 11/20/23, at 8). This in-the-moment and face-to-face accusation bears little resemblance to an anonymous tip.

*Id.* at 11. Moreover, the complainant

> is seen in the background of body-worn camera footage as [Appellant] is being frisked. If Sergeant Battista had approached the incorrect suspect, the [complainant] was readily available to correct that error.

*Id.* at 12. The Commonwealth points out that Appellant also "matched the description of the earlier [police radio] flash information," which described the perpetrator as "an African-American man wearing black clothing with a gun at

- 10 -

the subway station just across the street from where [Appellant] was stopped." *Id.* at 14.

Finally, the Commonwealth maintains that the cases upon which Appellant relies, *i.e.*, **Hayward** and **J.N.Y.**, "are readily distinguishable." Commonwealth Brief at 9. "Both **Hayward** and **J.N.Y**[**.**] involved exceedingly vague descriptions of people who allegedly committed some wrong prior to the tipsters' interaction with officers." *Id.* at 11.

"Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." **Commonwealth v. Lewis**, 343 A.3d 1016, 1024 (Pa. 2025) (citations omitted); *see also id.* ("Our scope of review is limited to the record of the suppression hearing." (citation omitted)). "We are bound by the facts found by the [suppression] court so long as they are supported by the record, but we review its legal conclusions *de novo*." **Commonwealth v. Rivera**, 316 A.3d 1026, 1031 (Pa. Super. 2024). "We are highly deferential to the suppression court's factual findings and credibility determination[s]." **Commonwealth v. Carmenates**, 266 A.3d 1117, 1123 (Pa. Super. 2021) (*en banc*); *see also Commonwealth v. Byrd*, 185 A.3d 1015, 1019 (Pa. Super. 2018) ("The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." (citation omitted)). "Where, as here, the defendant is appealing the ruling of the suppression

court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted." **Commonwealth v. Yandamuri**, 159 A.3d 503, 516 (Pa. 2017) (citation omitted).

"[I]t is hornbook law that the Fourth Amendment to the United States Constitution as well as Article I, § 8 of the Pennsylvania Constitution protect citizens from unreasonable searches and seizures." **Commonwealth v. Simmons**, 17 A.3d 399, 402-03 (Pa. Super. 2011) (citation, brackets, and quotation marks omitted). "At a suppression hearing, the Commonwealth has the burden of establishing by a preponderance of the evidence that the evidence was properly obtained." **Commonwealth v. Heidelberg**, 267 A.3d 492, 498 (Pa. Super. 2021) (*en banc*) (citation and quotation marks omitted); **see also** Pa.R.Crim.P. 581(H). "The preponderance of the evidence is the lowest burden of proof in the administration of justice, and it is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly in one's favor." **Commonwealth v. Easter**, 331 A.3d 675, 680 (Pa. Super. 2025) (citations and internal quotation marks omitted); **see also Commonwealth v. Watson**, 292 A.3d 562, 567 (Pa. Super. 2023) (defining preponderance of the evidence as "tantamount to a more likely than not inquiry." (citation omitted)). This Court has stated the suppression of evidence "is a most extreme remedy that can be justified only when it is necessary to vindicate fundamental rights or to correct or deter police abuse." **Commonwealth v.**

*Huntington*, 924 A.2d 1252, 1259 (Pa. Super. 2007) (citation and quotation marks omitted).

We begin by recognizing the three categories of interaction between police and citizens:

> [T]he first … is a "mere encounter" (or request for information)[,] which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention[,]" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Way*, 238 A.3d 515, 518 (Pa. Super. 2020) (citation omitted).

Instantly, the parties agree that the police encounter initiated as an investigative detention.[8] Pennsylvania has adopted the holding of *Terry v. Ohio*, 392 U.S. 1 (1968), where the United States Supreme Court held that police may conduct an investigative detention if they have reasonable suspicion that criminal activity is afoot. *In re: D.M.*, 781 A.2d 1161, 1163 (Pa. 2001). In *Terry*, the Supreme Court held that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer

---

[8] The Commonwealth states it "agrees with [Appellant] that he became subject to an investigative detention when Sergeant Battista began to pat him down while asking if [Appellant] had a firearm on him." Commonwealth Brief at 9; *see also* Appellant's Brief at 12.

- 13 -

or to others," the officer may conduct a pat-down search "to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." **Terry**, 392 U.S. at 24. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." **Simmons**, 17 A.3d at 403 (citation omitted).

"In order to determine whether the police had reasonable suspicion, the totality of the circumstances—the whole picture—must be considered." **Id.** (citation omitted).

> [T]he fundamental inquiry is an objective one, namely, whether the facts available to police at the moment of the intrusion warrant a person of reasonable caution in the belief that the action taken was appropriate.
>
> This Court has recognized reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity.
>
> To demonstrate reasonable suspicion, the detaining officer must articulate something more than an inchoate and unparticularized suspicion or hunch. To determine whether reasonable suspicion exists, we examine the totality of the circumstances through the eyes of a trained officer and not an ordinary citizen.

**Commonwealth v. Rivera**, 311 A.3d 1160, 1164-65 (Pa. Super. 2024) (citation omitted). "Reasonable suspicion is a relatively low standard and depends on the information possessed by police and its degree of reliability in the totality of the circumstances." **Commonwealth v. Shaw**, 246 A.3d 879,

883 (Pa. Super. 2021) (citation omitted); *see also Commonwealth v. Walls*, 206 A.3d 537, 541 (Pa. Super. 2019) ("Reasonable suspicion is a less stringent standard than [the] probable cause [standard.]" (citation omitted)).

This Court has stated that in assessing whether reasonable suspicion exists to conduct a frisk pursuant to *Terry*, a police officer "need not be absolutely certain that the individual is armed; [rather,] the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger." *Commonwealth v. Taylor*, 771 A.2d 1261, 1269 (Pa. 2001) (citing *Terry*, 392 U.S. at 27). However, we acknowledge that

> [i]n Pennsylvania, where many citizens are licensed to carry concealed firearms, gun possession alone does not provide reasonable suspicion of a crime. [*Commonwealth v.*] *Hicks*, 208 A.3d [916,] 937 [(Pa. 2019)]. "Absent some other circumstances giving rise to a suspicion of criminality, a seizure [based only on carrying a firearm] is unreasonable." *Id.* at 945.

*Rivera*, 311 A.3d at 1165; *see also Hayward*, 756 A.2d at 27.

This Court addressed reasonable suspicion based on anonymous tips in *Commonwealth v. Mackey*, 177 A.3d 221 (Pa. Super. 2017), stating as follows:

> Where an investigative detention is based on an anonymous tip, "we must determine whether under the totality of the circumstances the informant's tip established the necessary reasonable suspicion that criminal activity was afoot." *Commonwealth v. Martin*, 705 A.2d 887, 892 (Pa.[ ]Super. 1997) (quoting *Alabama v. White*, 496 U.S. 325, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990)). The veracity and reliability of anonymous tips are particularly difficult for the police to evaluate. *See White*, 496 U.S. at 325. **Unlike** trusted (or at least tested)

informants or **members of the public not concealing their identity**, anonymous tipsters know they cannot be held to account for false allegations. **See Florida v. J.L.**, 529 U.S. 266, 270, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000). In addition, they often fail to reveal the basis for their alleged knowledge and are generally unavailable to answer follow-up questions from police. **See White**, 496 U.S. at 329 (citing **Illinois v. Gates**, 462 U.S. 213, 237, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)).

**Mackey**, 177 A.3d at 230 (emphasis added).

Our Supreme Court has explained that a tip by a known individual is presumed more reliable because the individual places themselves at risk of prosecution for filing a false claim if the tip is untrue, whereas an anonymous tip may be a "prank call" or "based on no more than the caller's unparticularized hunch." **Commonwealth v. Jackson**, 698 A.2d 571, 574 (Pa. 1997) (citations omitted). The **Jackson** Court held that "a **Terry** stop may be made on the basis of an anonymous tip, provided the tip is sufficiently corroborated by independent police work to give rise to a reasonable belief that the tip was correct." **Id.**

This Court has held that

the word of an anonymous informant alone, without any knowledge of that informant's reliability or any independent corroboration or observation of illegal activity by the police, [cannot] serve as the basis for subjecting an individual citizen to detention and a physical search of his or her person. This is because, in our free and democratic society, a stop of a citizen by a police officer and a search of that citizen is not to be regarded as a minor or trifling disruption of that citizen's constitutionally guaranteed right to be free of unreasonable searches and seizures.

*Hayward*, 756 A.2d at 28. Rather, when responding to an anonymous tip, "[s]ome additional corroboration of [the accused's] involvement in criminal activity is required before a *Terry* stop may be undertaken." *Id.* at 32.

Instantly, the trial court, in its Pa.R.A.P. 1925(a) opinion,[9] determined that it properly denied Appellant's suppression motion, reasoning as follows:

> Sergeant Battista, a police officer of 25 years, was approached by [**the complainant,**] **who pointed at** [Appellant] **and reported that** [Appellant] **just tried to rob him with a gun. These explicit facts alone provided reasonable suspicion to detain** [**Appellant**] **for investigation**, and given the nature of a gunpoint robbery, also supported a frisk for weapons. Sergeant Battista then walked up to [Appellant] and asked him five or six times if he had a firearm on him, but [Appellant] refused to cooperate by declining to answer each time. This behavior only heightened the sergeant's suspicion that [Appellant] had just committed a gunpoint robbery.
>
> Accordingly, Sergeant Battista informed [Appellant] that he was not under arrest, he was just being detained -- and when [Sergeant Battista] attempted to apply handcuffs for everyone's safety, [Appellant] took off running toward the exit doors. At that point, given the totality of the circumstances, police had probable cause to arrest [Appellant], and the gun was lawfully recovered pursuant to that arrest. *See*, *e.g.*, *Commonwealth v. Stevenson*, 894 A.2d 759, 775 (Pa. Super. 2006) (where police have reasonable suspicion to conduct an investigatory detention, a defendant's attempt to flee during that detention confers probable cause to arrest), *overruled in part on other grounds by* [] *Hicks*, 208 A.3d 916 ….
>
> * * *
>
> [Appellant] argued below that since he was stopped pursuant to an "anonymous tip," police needed independent information to corroborate the tip.[FN11] Here, however, **there**

_____

[9] The judge who issued the Rule 1925(a) opinion also presided over the suppression proceedings.

**was no anonymous tip**[**; rather**]**, there was an actual report in person.** Indeed, unlike an anonymous phone call that is inherently unreliable, [**see Mackey**, 177 A.3d at 230,] the complainant in this case approached … [S]ergeant [Battista] and emphatically reported that [Appellant] had just attempted to rob him with a gun. Moreover, **while he was not subsequently identified, the complainant remained at the scene and watched as the police conducted their investigation.** (**See** Exhibit C-8 at 0:58-1:13; Exhibit C-7 at 0:31-0:36). All told, the concern of an anonymous call being a "prank" clearly did not apply here.

---

[FN11] **Compare Commonwealth v. Wimbush**, 750 A.2d 807, 811 (Pa. 2000) ([stating that] in the case of an anonymous tip, corroboration is required because "[a]n anonymous tip may be nothing more than a prank call. At the same time[,] it may be based on no more than the caller's unparticularized hunch.") (citations omitted), **with Commonwealth v. Barber**, 889 A.2d 587, 593 (Pa. Super. 2005) ("[I]dentified citizens who report their observations of criminal activity to police are assumed to be trustworthy, in the absence of special circumstances, since a known informant places himself at risk of prosecution for filing a false claim if the tip is untrue, whereas an unknown informant faces no such risk.") (citation omitted).

Trial Court Opinion, 11/25/24, at 10-11 (emphasis added; footnote in original; one original footnote omitted).

The trial court's foregoing analysis is supported by the record and the law, and we agree with its determination. **See id.** Contrary to Appellant's claim, the instant case bears no similarity to situations involving "anonymous tips"; rather, the complainant identified Appellant as the perpetrator of the attempted robbery, in-person at the scene, by pointing at Appellant and stating, "[T]his guy just tried to rob [me] with a gun." N.T., 11/20/23, at 8-9.

- 18 -

Moreover, we agree with the Commonwealth that the cases upon which Appellant relies, *i.e.*, *Hayward* and *J.N.Y.*, are distinguishable and unavailing. In *J.N.Y.*, a juvenile, who was adjudicated delinquent of possession of drug paraphernalia, appealed the denial of her suppression motion, asserting authorities lacked reasonable suspicion to search her and seize her purse containing the paraphernalia. *J.N.Y.*, 931 at 687. In the juvenile court, the Commonwealth presented testimony from a teacher at the juvenile's high school (the teacher). *Id.* at 686. The teacher testified she received information that the juvenile was in possession of two marijuana pipes. *Id.* Pertinently, **the teacher could not recall from whom she received this information**, vaguely testifying that the information came from "multiple sources," including students and other teachers. *Id.* The teacher relayed this information to the school's vice principal, who sought out the juvenile. *Id.* The vice principal located the juvenile, escorted her to his office, and asked her to empty out her purse. *Id.* The juvenile eventually complied, and her purse was found to contain two marijuana pipes. *Id.*

After the juvenile was charged with possession of drug paraphernalia, she "filed a motion to suppress the evidence on the basis that the search and seizure of … her purse were illegal because [authorities] did not have the requisite reasonable suspicion to conduct the same." *Id.* at 687. Following a hearing, the juvenile court denied the suppression motion. *Id.*

On appeal, this Court reversed. We emphasized that the teacher could not recall from whom she had received information regarding the juvenile's possession of paraphernalia. *Id.* at 688. We also observed that the vice principal "testified that there was nothing unusual about [the juvenile's] appearance or speech at any time." *Id.* (citation omitted). We concluded that "the **effectively anonymous tips** alleging that [the juvenile] was in possession of two marijuana pipes, without more, did not provide reasonable suspicion for a search of the [juvenile's] purse." *Id.* at 688-89 (emphasis added; footnote omitted). In support, we cited *Commonwealth v. Goodwin*, 750 A.2d 795 (Pa. 2000), wherein our Supreme Court held that an uncorroborated, anonymous tip alleging that the defendant was selling marijuana was insufficient to provide reasonable suspicion necessary for an investigatory stop of the defendant's vehicle. *J.N.Y.*, 931 at 688 (citing *Goodwin*, 750 A.2d at 799).

In *Hayward*, a police officer (the officer) conducting routine foot patrol received information from an "unidentified passerby" (hereinafter, "the pedestrian") that there was a group of men assembled in a nearby park (the park), and that one of the men was "brandishing a weapon." *Hayward*, 756 A.2d at 25 (citation omitted). The pedestrian informed the officer "that the man in the park with the weapon was 'tall[.]'" *Id.* (citation omitted); *see also id.* (**the pedestrian "did not provide any further descriptive identification of the man in the park with the weapon**, such as the man's

race or the clothing which he was wearing." (emphasis added)).  The pedestrian did not identify himself to police, and the officer testified that he had never seen the pedestrian before or since.  **Id.**

The officer proceeded to the park,[10] accompanied by six other police officers, and located a group of eight or nine people, including the defendant. **Id.** at 25-26; **see also id.** at 26 (the officer testifying he did not observe any individual in possession of a weapon).  The officer noticed that the defendant appeared to be the tallest individual in the group, but conceded that other individuals in the group were "very close" in height to the defendant.  **Id.** at 26.  The officer then ordered all individuals in the group to "line up," and they complied.  **Id.**  The officer asked if anyone had a weapon; the defendant responded in the affirmative.  **Id.**  Police frisked the defendant and discovered a handgun on his person.  **Id.**

After the defendant was arrested and charged with gun offenses, he filed a suppression motion, which the trial court denied.  The defendant was convicted of firearm offenses following a bench trial.  **Id.**  The defendant appealed, challenging the denial of his suppression motion and claiming police lacked reasonable suspicion to detain and frisk him.  **Id.**

This Court reversed, holding that

> if police receive unverified information from an unknown person, which consists **solely of a generalized description of a person**

_____

[10] The pedestrian did not accompany the officer to the park.  **Hayward**, 756 A.2d at 35.

- 21 -

**allegedly engaged in criminal activity at a particular location**, that information, in and of itself, does not provide the police with the requisite reasonable suspicion to detain and search an individual who merely happens to be at the specified location and who matches the general description given by the informant. Some other independent corroboration of the individual's involvement in criminal activity is required. Mere *presence alone* of an individual at a particular place, as described by the anonymous informant, does not establish that the individual is engaged in criminal activity.

*Id.* at 29-30 (bold emphasis added; italics emphasis in original).

The *Hayward* Court further stated that

[m]erely because the [pedestrian] … conveyed his information in person to the [officer,] as opposed to telephonically[,] did not automatically endow the information contained within [the pedestrian's] tip with greater presumed accuracy and reliability. Nor did it establish that he was acting with veracity. The [pedestrian] who approached the officer on the street was completely unknown to [the officer]. The officer had never seen [the pedestrian] before or had any knowledge that this individual had provided accurate and reliable information to the police in the past. The [pedestrian] did not identify himself to the officer, **nor did he accompany the officer to the park to point out the individual who was "brandishing the weapon."** The nameless pedestrian did not appear … to testify as to his observation that he saw the [defendant] "brandishing a weapon." The pedestrian was and is, in all respects, a completely anonymous individual, and as such, his reliability is equivalent to that of an unknown individual who telephones an anonymous tip to the police that there is a man with a gun in a particular location.

*Id.* at 35 (emphasis added).

The instant case does not present a situation where Appellant's "mere presence" nearby the scene of the reported attempted robbery implied to Sergeant Battista that Appellant was engaged in criminal activity. *Id.* at 30. Unlike *Hayward*, the complainant, in the presence of police, pointed directly

at Appellant, accusing Appellant of having "just" attempted to rob the complainant at gunpoint. N.T., 11/20/23, at 8-9. *Cf. Hayward*, 756 A.2d at 35; *see also Commonwealth v. Anderson*, 392 A.2d 1298, 1300 (Pa. 1978) (holding police lacked reasonable suspicion based on a telephonic tip, "supplied by an anonymous caller whose reliability was unknown," where "only a general description [of the defendant] was given, one which would fit any number of individuals," and there was no police corroboration of the tip, and **distinguishing a situation where "the defendant was pointed out to the officer by the person providing the information."** (emphasis added)). Moreover, as stated *supra*, the complainant did not specifically attempt to conceal his identity, and the police body camera video confirms that he remained in the area while police were investigating Appellant.

The facts of the instant case are more akin to the situation in *Commonwealth v. Williams*, 980 A.2d 667 (Pa. Super. 2009). In that case, a police officer (Officer McGinnis) was on routine patrol when he received a police radio call reporting a robbery in progress at a certain street corner. *Id.* at 669. When Officer McGinnis arrived at the corner, he observed (1) the appellant walking on the sidewalk, being pursued by two female police officers on foot; and (2) "a Hispanic male pointing up to [appellant] yelling, "He has got a gun."[11] *Id.* (citation omitted). Appellant ignored police commands to

_____

[11] The Hispanic male was not identified by law enforcement.

stop and fled, discarding a handgun during his flight. *Id.* Police eventually placed appellant in custody, recovered the gun, and charged him with firearms offenses. *Id.* Appellant filed a motion to suppress the gun, which the trial court denied. *Id.* Following appellant's conviction of firearms offenses, he appealed the denial of his suppression motion. *Id.* at 670

This Court affirmed, concluding that police had reasonable suspicion based on the totality of the circumstances, reasoning as follows:

> Officer McGinnis had just received a radio call advising of a robbery in progress, observed appellant in the immediate vicinity of the reported robbery attempting to avoid two female officers who were approaching him on foot, and encountered a[n anonymous] witness who was pointing at appellant yelling, "He has got a gun."
>
> Appellant argues that the witness' statement, "He has got a gun" is the equivalent of an uncorroborated, anonymous tip, and is insufficient to establish reasonable suspicion justifying an investigatory stop. We disagree. Each of the cases cited by appellant on this point involve anonymous phone calls to the police regarding criminal activity. The situation here, however, is distinguishable in that **the tip was made in person, giving Officer McGinnis an opportunity to observe the witness' demeanor and assess his credibility in light of his past experience with investigating crimes. Such a tip must be given more weight than a mere anonymous phone call** because a person who knowingly gives false information to any law enforcement officer with intent to implicate another may be held criminally liable.

*Id.* at 671-72 (emphasis added; internal citations, footnote, and quotation marks omitted; some capitalization modified).

In sum, we conclude the suppression court correctly determined that the complainant's in-person identification of Appellant as the perpetrator

- 24 -

sufficiently established reasonable suspicion to conduct a lawful investigatory detention of Appellant. Accordingly, the suppression court properly denied Appellant's suppression motion. Appellant's first issue merits no relief.

In his second issue, Appellant challenges the sufficiency of the evidence underlying his conviction of persons not to possess firearms, 18 Pa.C.S.A. § 6105. *See* Appellant's Brief at 21-31. Appellant contends his "prior conviction for 'manslaughter' in Florida did not support his conviction under Section 6105," where (1) the Florida statute governing manslaughter—discussed *infra*—is "not equivalent to any disqualifying Pennsylvania offense" in subsection 6105(b); and (2) "the mere proof of a conviction under [Florida's manslaughter statute] did not support the [Section] 6105 conviction." *Id.* at 21 (bold and footnote omitted; some capitalization modified).

A challenge to the sufficiency of the evidence presents a pure question of law; accordingly, "our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Rosario*, 307 A.3d 759, 764-65 (Pa. Super. 2023) (citation omitted).

> When performing a sufficiency review, we consider whether the evidence introduced at trial and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish the elements of the offense beyond a reasonable doubt.

*Commonwealth v. Smith*, 234 A.3d 576, 581 (Pa. 2020) (citation omitted).

Section 6105 defines persons not to possess firearms, in relevant part, as follows:

- 25 -

**(a) *Offense defined*.**

**(1)** A person who has been **convicted of an offense enumerated in subsection (b), within or without this Commonwealth**, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

* * *

**(b) *Enumerated offenses*.** The following offenses shall apply to subsection (a):

* * *

Section 2503 (relating to voluntary manslaughter).

Section 2504 (relating to involuntary manslaughter) if the offense is based on the reckless use of a firearm.

* * *

Any offense equivalent to any of the above-enumerated offenses under the prior laws of this Commonwealth or **any offense <u>equivalent</u> to any of the above-enumerated offenses under the statutes of any other state** or of the United States.

18 Pa.C.S.A. § 6105(a), (b) (emphasis added).

In short, section 6105 has two material elements: "(1) that the person has been convicted of an offense listed in [s]ubsection (b) …; and (2) that the person possesses or otherwise controls a firearm." ***Commonwealth v. Alvarez-Herrera***, 35 A.3d 1216, 1218 (Pa. Super. 2011). Instantly, Appellant challenges only the first element, as he does not dispute that he

possessed a firearm at the time of his arrest.[12]  **See** Appellant's Brief at 21-31.

This Court has stated that a predicate "equivalent offense" under section 6105(b) is an offense that "is substantially identical in nature and definition as the out-of-state or federal offense when compared to the Pennsylvania offense." **Commonwealth v. Cyran**, 203 A.3d 1012, 1015 (Pa. Super. 2019) (citing **Commonwealth v. Robertson**, 722 A.2d 1047, 1049 (Pa. 1999)). "[I]n determining whether offenses are substantially identical, a court should compare the requisite elements of the crime, including the *actus reus* and the *mens rea*." **Id.**  A court also "must compare 'the conduct to be prohibited and the underlying public policy of the two statutes.'" **Id.** (quoting **Robertson**, 722 A.2d at 1049).  Moreover, our Supreme Court has instructed that, in assessing whether two statutes are equivalent, "the focus is not on the facts underlying a conviction, but rather on the statute that triggered the conviction." **Commonwealth v. Northrip**, 985 A.2d 734, 741 (Pa. 2009).

Instantly, Appellant argues that although the Commonwealth "prove[d] a specific conviction for 'manslaughter' under Florida law, that offense was not equivalent to either form of manslaughter enumerated in Section 6105(b)." Appellant's Brief at 22 (emphasis omitted); **see also** 18 Pa.C.S.A. § 6105(b). Appellant claims that "[a]n out-of-state offense is only 'equivalent' to a

_____

[12] Appellant also does not dispute that he had no license to carry a firearm.

Pennsylvania offense if they share the same elements[,]" which is not the situation here. Appellant's Brief at 22 (bold omitted). According to Appellant, the statute governing manslaughter in the State of Florida "is far more general than the provisions identified in Section 6105(b)" and "encompasses all types of negligent homicide, regardless of the means by which death occurs." *Id.* at 29.

The Commonwealth counters Appellant's conviction of persons not to possess firearms is supported by sufficient evidence, where he possessed a firearm on the date in question and stipulated that his Florida conviction of manslaughter disqualified him from possessing a firearm under section 6105. *See* Commonwealth Brief at 15-18. The Commonwealth asserts that although Appellant contends "his prior Florida conviction for manslaughter is supposedly not 'equivalent' to any disqualifying Pennsylvania offense," he "stipulated at trial that his Florida manslaughter conviction was a disqualifying offense, which is binding on sufficiency review." *Id.* at 15.

Appellant, in his reply brief, argues that he "could not, and did not, 'stipulate' to his disqualification to possess a firearm." Appellant's Reply Brief at 1 (bold omitted; some capitalization modified).

> [A]ppellant's counsel did stipulate to the authenticity—more precisely, the facts that would establish authenticity—of the document that proved [Appellant's Florida] manslaughter conviction. [Appellant's counsel] could also have stipulated to the **fact** of the manslaughter conviction itself. What [counsel] could not meaningfully do (and in fact did not purport to do …), was "stipulate to" the **legal significance** of that conviction, which was a pure question of law.

*Id.* at 2-3 (emphasis added; original emphasis omitted).

Appellant concedes the prosecutor stated that Appellant's Florida conviction of "manslaughter… would disqualify [Appellant] under [Section] 6105 from possessing a [firearm]." *Id.* at 7 (quoting N.T., 3/20/24, at 10). However, according to Appellant, the prosecutor's

> reference to the disqualifying effect of the conviction was his own comment, for the [trial] court's benefit, on the significance of the information he was providing. It was not a component of the "stipulation."

*Id.*

"A stipulation is a declaration that the **fact** agreed upon is proven, and a valid stipulation must be enforced according to its terms." *Commonwealth v. Mitchell*, 902 A.2d 430, 460 (Pa. 2006) (citation and brackets omitted; emphasis added); *see also Smith*, 234 A.3d at 585 n.10 (stating that the "underlying facts of [a] stipulation are to be accepted as undisputed and require no further proofs and will permit no contradictory evidence[.]" (citation, emphasis, and quotation marks omitted)). However, it is established that **courts are "not bound by stipulations as to questions of law."** *Commonwealth v. Legg*, 711 A.2d 430, 440 n.9 (Pa. 1998) (emphasis added; citations omitted); *see also Estate of Sanford v. Commissioner*, 308 U.S. 39, 51 (1939) (stating courts "are not bound to accept, as controlling, stipulations as to questions of law."); *Commonwealth v. Perrin*, 291 A.3d 337, 344 (Pa. 2023) (explaining that areas not subject to stipulation

include those which are "inherently and traditionally the prerogative of the judiciary.").

Instantly, the parties stipulated that Appellant's Florida conviction "on one charge of manslaughter… would disqualify him under [section] 6105 from possessing a firearm." N.T., 3/20/24, at 9-10; *see also id.* at 10 (admitting into evidence Commonwealth Exhibit 5, *i.e.*, the Florida court document noting Appellant's 1999 adjudication of guilty for manslaughter). Per this stipulation, Appellant is bound by the **fact** of his prior Florida conviction for manslaughter, which he does not dispute. *Mitchell*, 902 A.2d at 460; Appellant's Reply Brief at 2-3. However, Appellant is not bound by the stipulation's assertion that the Florida manslaughter conviction "would disqualify [Appellant] under [section] 6105 from possessing a firearm[,]" N.T., 3/20/24, at 9-10, as this is a question of law within the prerogative of the trial court.[13] *See Legg*, *supra*; *Perrin*, *supra*.

We next address whether Appellant's Florida conviction for manslaughter is "equivalent" to a predicate offense enumerated in subsection 6105(b). To the extent that this issue "requires us to engage in statutory interpretation," it "presents a question of law, of which we engage in a *de*

---

[13] Although Appellant concedes that, at trial, he lodged no objection to the Florida conviction stipulation, *see* Appellant's Brief at 8, it is settled that a "sufficiency of evidence claim cannot be waived under [Pa.R.A.P.] 302(a) because Pa.R.Crim.P. 606(A)(7) expressly provides that sufficiency challenge may be raised for first time on appeal[.]" *Commonwealth v. Cravener*, 344 A.3d 370, 377 (Pa. Super. 2025) (citation omitted).

*novo* review." ***Commonwealth v. Seals***, ___ A.3d ___, 2026 PA Super 29 (Pa. Super. filed Feb. 17, 2026) (*en banc*) (Slip Op. at 35) (internal citation and quotation marks omitted; italics added).

The Statutory Construction Act, 1 Pa.C.S.A. §§ 1501-1991, "guides our analysis of statutory text." ***Seals***, 2026 PA Super 29 (Slip Op. at 24). "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S.A. § 1921(a). "The statute's plain language generally provides the best indication of legislative intent." ***A.S. v. Pa. State Police***, 143 A.3d 896, 903 (Pa. 2016) (citation omitted). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(b).

This Court has stated that

> [t]he General Assembly has instructed courts to ascribe the "common and approved meaning" to its chosen words and phrases, unless the word or phrase is technical, has acquired a peculiar and appropriate meaning, or is expressly defined in the statute. 1 Pa.C.S. § 1903(a). We consider the statutory language not in isolation, but within the context in which it appears. ***Commonwealth v. Rosario***, 294 A.3d 338, 346 (Pa. 2023); ***A.S.*** …, 143 A.3d [at] 906…. "Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a).

***Seals***, 2026 PA Super 29 (Slip Op. at 24-25).

Here, in its Rule 1925(a) opinion, the trial court, which also acted as fact-finder, concluded that, notwithstanding the Florida conviction stipulation, "the charge of manslaughter in Florida is essentially similar to the offense

proscribed in Pennsylvania[,]" specifically, voluntary manslaughter.[14] Trial

Court Opinion, 11/25/24, at 15. The trial court reasoned as follows:

> Florida defines manslaughter, in relevant part, as:
>
>> (1) The killing of a human being by the act, procurement, or **culpable negligence** of another, without lawful justification according to the provisions of chapter 776 and in cases in which such killing shall not be excusable homicide or murder ….
>
> F.S.A. § 782.07(1)[ (emphasis added); ***see also Dean v. State***, 230 So.3d 420, 423 (Fla. 2017) ("Based on [subsection 782.07(1)], the two elements of manslaughter are the unjustified or inexcusable killing of the victim and a causative link between the death and the act, procurement, or culpable negligence of the defendant." (citation and quotation marks omitted)).]
>
> Pennsylvania defines voluntary manslaughter as follows:
>
>> **(a) General rule.**-- A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

---

[14] Although, under subsection 6105(b), involuntary manslaughter is enumerated as a disqualifying offense, such a conviction will prohibit a person from possessing a firearm under subsection 6105(a) only "if the offense is based on the reckless use of a firearm." 18 Pa.C.S.A. § 6105(b). In the instant case, it is undisputed that the record does not clarify whether Appellant possessed a firearm in connection with the incident that formed the basis for his Florida adjudication of guilty for manslaughter. **See** Commonwealth Brief at 17 n.6; Appellant's Brief at 31. Nevertheless, even if the record contained this information, we could not delve into the facts to make the determination regarding what led to Appellant's prior Florida conviction. **See *A.L. v. Pennsylvania State Police***, 274 A.3d 1228, 1237-38 (Pa. 2022) (precluding a reviewing court from examining the record underlying a prior conviction to determine what the defendant did—"as opposed to what he was convicted of"—so as "to remove guesswork, inconsistency, and *ad hoc* agency decision-making, [as well as] to promote the legislative focus on prior convictions rather than prior actions").

> (1) the individual killed; or
>
> (2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.
>
> **(b) Unreasonable belief killing justifiable.**-- A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

18 Pa.C.S.A. § 2503[(a), (b)] …. ***See also Commonwealth v. White***, 424 A.2d 1296, 1297 (Pa. 1981) ("Voluntary manslaughter is a killing committed without malice, in the heat of passion or under the unreasonable belief that it was justified.").

Thus, both [section 2503 and Florida's section 782.07(1)] proscribe the killing of another human being without malice, [regardless of] whether [the killing was] intentional or unreasonable (*i.e.*, **the equivalent of acting negligently**). ***See*** [***McCreary***, 371 So. 2d at 1026;] ***Rogers v. Thomas***, 291 A.3d 865, 877-78 & n.14 (Pa. Super. [2023] (*en banc*)], ***appeal denied***, 304 A.3d 706 (Pa. 2023) (where defendant acted "unreasonably" in his belief that he was justified in the use of deadly force, such "unreasonable belief" was the equivalent of acting "negligently") (citing ***Rutter v. Northeastern Beaver County School District***, 437 A.2d 1198, 1212 (Pa. 1981) (Nix, J. dissenting) ("The benchmark of negligence is conduct expected of the proverbial reasonable man."); … ***Martin v. Evans***, 711 A.2d 458, 461 (Pa. 1998) (**negligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances**)….

As such, the [trial c]ourt finds that the offense of manslaughter in Florida is "essentially similar to the offense proscribed in Pennsylvania." ***Freeman*** [***v. Pennsylvania State Police***], 2 A.3d [1259,] 1262 [(Pa. Cmwlth. 2010)] (internal quotations and citations omitted). [Appellant's] claim – that he is actually entitled to possess a firearm – is without merit.

Trial Court Opinion, 11/25/24, at 15-17 (emphasis added; some citations modified).

After careful review, we disagree with the trial court's analysis and legal conclusion. Initially, the trial court applied the incorrect standard in assessing the equivalency of the respective statutes of Florida and Pennsylvania. Specifically, the trial court found that the two statutes are "essentially similar[,]" Trial Court Opinion, 11/25/24, at 17, as opposed to being "**substantially identical** in nature and definition[.]" *Cyran*, 203 A.3d at 1015 (emphasis added; citation omitted).

Moreover, the trial court relied on Pennsylvania civil decisions, which implicate the **tort** definition of negligence, to conclude that the *mens rea* for voluntary manslaughter under section 2503(b) is negligence[15] and, thus, the same as the "culpable negligence" requirement under section 782.07(1). *See* Trial Court Opinion, 11/25/24, *supra*. Criminal negligence, however, differs from tort negligence in Pennsylvania. *See*, *e.g.*, *Commonwealth v. Huggins*, 836 A.2d 862, 867 (Pa. 2003) (observing "the fact that criminal

---

[15] The *mens rea* for voluntary manslaughter under subsection 2503(b) is not negligence; rather, the Commonwealth must prove that the accused acted intentionally or knowingly in committing the killing. *See*, *e.g.*, *Commonwealth v. Weston*, 749 A.2d 458, 462 (Pa. 2000) ("A killing that occurs under the mistaken belief that it was justified constitutes voluntary manslaughter. Voluntary manslaughter, imperfect self-defense, requires that the Commonwealth establish that the defendant intentionally and knowingly killed another." (internal citations and quotation marks omitted)).

negligence differs from tort negligence"). Indeed, in **Rogers**, **supra**—*i.e.*, one of the civil cases upon which the trial court in the instant case relied—this Court stated that "[w]e do not equate criminal negligence with the civil tort of negligence." **Rogers**, 291 A.3d at 878 n.14.

> Pursuant to section 302 of our Crimes Code,
>
> [a] person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and intent of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b)(4). Our Supreme Court has emphasized, "The negligence required to merit criminal sanctions under Section 302 is certainly a heightened deviation from the standard of care applicable when civil tort liability is at issue." **Huggins**, 836 A.2d at 867.

> Under Florida criminal law, by contrast,
>
> [t]here is no uniform schedule of specific acts that constitute culpable negligence. Rather, "[c]ulpable negligence is the omission to do something which a reasonable, prudent and cautious man would do, or the doing of something which such a man would not do under the circumstances surrounding the particular case." **Russ v. State**, 140 Fla. 217, 191 So. 296, 298 (Fla. 1939)…. While, at first blush, **Russ**'s culpable negligence definition may look somewhat similar to the textbook tort definition of "negligence," the degree of negligence required to sustain a conviction for the crime of culpable negligence is significantly higher than that necessary to sustain a recovery of compensatory damages in a tort case.

*Aledda v. State*, 337 So. 3d 846, 850 (Fla. Dist. Ct. App. 2022) (emphasis and some citations omitted); *see also Kelley v. State*, 341 So. 3d 468, 471 (Dist. Ct. App. 2022) (stating that "[s]ince *Russ*, Florida courts have continued to hold that only the most egregious conduct satisfies the culpable negligence standard.").

Additionally, the trial court erred in concluding that both section 2503 and Florida's section 782.07(1) "proscribe the killing of another human being without malice," regardless of whether the killing was "intentional or **unreasonable**." Trial Court Opinion, 11/25/24, at 16 (emphasis added). To the contrary, the *mens rea* for voluntary manslaughter under subsection 2503(b) requires that the killing be committed "intentionally or knowingly[,]" *Weston*, *supra*; under that subsection, it is the basis for an accused's asserted justification defense that is "unreasonable," as opposed to the crime itself.

Based upon the foregoing, we conclude Florida's section 782.08(1) is not substantially identical to Pennsylvania's voluntary manslaughter statute, Crimes Code Section 2503, as Florida's statute criminally punishes conduct that Pennsylvania's statute does not. *See*, *e.g.*, *Commonwealth v. Shaw*, 744 A.2d 739, 744-45 (Pa. 2000) (in conducting an equivalency analysis of the respective driving under the influence (DUI) statutes of Pennsylvania and New York, holding that the statutes were not equivalent, where (1) New York's DUI statute "casts a wider net of criminal liability" than Pennsylvania's DUI

statute; and (2) "there is an appreciable difference in the elements of the in-state and out-of-state offenses at issue").  As Appellant persuasively argues,

> Florida's statute, on its face, is far more general than the provisions identified in Section 6105(b), and applies to a range of behavior that is not intentional ….   Most significantly, it encompasses all types of negligent homicide, regardless of the means by which death occurs.

Appellant's Brief at 29 (citations omitted).

Consequently, the trial court erred as a matter of law in determining that evidence of Appellant's prior Florida manslaughter conviction was sufficient to establish that he had been convicted of an enumerated offense under subsection 6105(b) and, as such, was prohibited from possessing a firearm under subsection 6105(a).[16]  Florida's statute governing manslaughter is not "substantially identical" to Pennsylvania's voluntary manslaughter statute.  ***Cyran***, 203 A.3d at 1015.  ***See also***, ***e.g.***, ***Commonwealth v. Washington***, 221 A.3d 1225, 464 EDA 2019 (Pa. Super. filed Sept. 4, 2019) (unpublished memorandum at 5-7)[17] (in a Commonwealth appeal, upholding the trial court's dismissal with prejudice the charge of persons not to possess firearms lodged against defendant, where (1) defendant's prior conviction of burglary in the State of New York was not equivalent to Pennsylvania's statute

---

[16] Additionally, there is no indication in the record that Appellant had another prior conviction that would preclude him from possessing a firearm under subsection 6105(a).

[17] Non-precedential decisions filed after May 1, 2019, may be cited for their persuasive value.  ***See*** Pa.R.A.P. 126(b).

for burglary, one of the enumerated offenses under subsection 6105(b); and (2) "the New York statute is [] broader than the Pennsylvania statute" and contains a different scienter requirement).

Accordingly, as Appellant's conviction of persons not to possess firearms is not supported by sufficient evidence, we vacate the judgment of sentence as to that conviction and remand for resentencing.[18] In all other respects, we affirm.

Judgment of sentence affirmed in part and vacated in part. Case remanded for resentencing. Stay vacated. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/10/2026

---

[18] We must vacate the entire judgment of sentence because our disposition regarding Appellant's conviction of persons not to possess firearms upsets the trial court's overall sentencing scheme. *See Commonwealth v. Smith*, 346 A.3d 1251, 1263 (Pa. 2025) (stating that vacatur of the entire judgment of sentence is required when an appellate court's actions "may upset the trial court's overall sentencing scheme"); *Commonwealth v. Sciarrino*, 328 A.3d 1169, 1174 (Pa. Super. 2024) (same).